# Illinois Official Reports

## Appellate Court

*People v. Coleman*, 2014 IL App (5th) 110274

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER COLEMAN, Defendant-Appellant. |
| District & No. | Fifth District<br>Docket No. 5-11-0274 |
| Filed | December 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the murders of his wife and two sons was upheld over his multiple claims of evidential error by the trial court, where the evidence presented, including the overwhelming circumstantial evidence, was sufficient to allow the jury to find defendant guilty of the three murders beyond a reasonable doubt. |
| Decision Under Review | Appeal from the Circuit Court of Monroe County, No. 09-CF-50; the Hon. Milton S. Wharton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | D. Peter Wise, of Gates, Wise & Schlosser, P.C., of Springfield, for appellant.<br><br>Kris F. Reitz, State's Attorney, of Waterloo (Patrick Delfino, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE GOLDENHERSH delivered the judgment of the court, with
                            opinion.
                            Justices Stewart and Schwarm concurred in the judgment and opinion.


**OPINION**

¶ 1        Defendant, Christopher Coleman, was charged by information with three counts of
first-degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) after his wife, Sheri, and his two sons,
Garett (date of birth April 30, 1998) and Gavin (date of birth January 25, 2000), were found
dead in the family home. After a jury trial in the circuit court of Monroe County, defendant was
convicted and sentenced to three concurrent life sentences. Defendant now appeals, raising the
following seven issues: (1) whether the trial court erred in allowing the State to present the
testimony of an expert linguist on the issue of authorship attribution, (2) whether the trial court
erred in allowing the State to present sexually explicit photographs and videos of defendant
and Tara Lintz, the woman with whom defendant was having an affair, (3) whether the trial
court erred in allowing five witnesses to testify to hearsay statements attributed to Sheri
Coleman regarding defendant's alleged desire to obtain a divorce and claims that Sheri was
ruining his life and whether the trial court erred in denying defendant's motion for a mistrial
after one of those witnesses testified that defendant beat Sheri, (4) whether the trial court erred
in admitting the expert testimony of Lindell Moore in which he compared spray-painted
writings found at the murder scene to defendant's handwriting, (5) whether the trial court erred
in admitting the testimony of Marcus Rogers and Kenneth Wojtowicz, who testified about
Internet Protocol (IP) addresses, (6) whether the trial court erred in allowing the admission of a
hardware store receipt and in allowing a witness to testify to its content, and (7) whether the
evidence adduced at trial proved defendant guilty beyond a reasonable doubt. For the
following reasons, we affirm.


¶ 2                                      FACTS
¶ 3                                   I. Pretrial
¶ 4        At 6:43 a.m. on May 5, 2009, defendant, who was employed as director of security for
Joyce Meyer Ministries (JMM), an internationally renowned Christian ministry headquartered
in Missouri, called his neighbor, Detective Sergeant Justin Barlow of the Columbia police
department. Defendant told Barlow he had been at the gym and after his workout he called
home to try to wake up his wife, Sheri, but Sheri did not answer. Defendant was concerned
something had happened to Sheri. Barlow was aware that defendant had made previous reports
to the Columbia police department that he and his family had been threatened due to his
employment with JMM. Sergeant Barlow went to defendant's house to check on the welfare of
defendant's family. Soon another officer arrived, and after ringing the doorbell and receiving
no answer, they went to the back of the house and saw a basement rear window standing open.
The police entered the home through the basement window and saw disturbing messages
written on the walls in red spray paint. Defendant arrived home and was told to stay outside.
The police went up the stairs to the second floor, where they found Garett, Gavin, and Sheri
dead.

¶ 5        When interviewed by the police, defendant told investigators Sheri was alive when he left the house at 5:45 a.m. to go to the gym. During the interview, police noticed scratches on defendant's arm. Defendant said he obtained one set of scratches a few days earlier, but was unsure how he got them. He said he received another abrasion on his arm after hitting his arm on the gurney in the ambulance in which he was transported after his family was found dead. Initially, defendant told the police his marriage was good, but later revealed that near the end of 2008, he and Sheri had some problems in their marriage, which they worked out through the help of counseling.

¶ 6        The police soon discovered defendant was having an affair with Tara Lintz, a high school friend of Sheri's who was living in Florida. Defendant denied the affair, but after being advised investigators were talking to Tara, defendant admitted to the affair, but minimized its intensity. As part of the murder investigation, many of defendant's and Sheri's friends were interviewed. Several friends told the police that Sheri was upset because defendant wanted a divorce. They said defendant told Sheri she was ruining his life, but he was afraid he would lose his job with JMM if he divorced her.

¶ 7        Investigators went to Florida and interviewed Tara. During the interview, she revealed, *inter alia*, that defendant told her he planned to serve divorce papers on Sheri on May 5, 2009, that she and defendant planned to go on a Caribbean cruise on June 14, 2009, and that they planned a tentative wedding date of January 2010. Tara also told investigators that she had been looking at engagement rings, registering on wedding registration websites, and looking for homes in the St. Louis area for her and defendant to live in upon their marriage, and that they had even discussed baby names.

¶ 8        Cybercrime investigators tracked threatening emails received by defendant pertaining to his job at JMM to defendant's laptop. In threatening letters addressed to defendant, the word "opportunities" was consistently misspelled as "oppurtunities." Cybercrime investigators found several documents on defendant's computer in which the word "opportunities" is misspelled in the same manner as it was in the threatening letters.

¶ 9        Medical reports, including the results of the autopsies, showed that Sheri, Garett, and Gavin were all dead before 5 a.m. Police checked defendant's cell phone records and investigated where the calls were placed by defendant on the morning of the murders. Based upon the foregoing, defendant was charged by information on May 20, 2009, with three counts of first-degree murder by strangulation.

¶ 10        Prior to trial, numerous motions were filed, including a motion *in limine* or, in the alternative, a motion for a *Frye* hearing (*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)) regarding forensic linguistic analysis. The motion set forth that discovery provided by the State indicated the State was going to "attempt to produce evidence that the defendant sent multiple threats to himself, by e-mail and letter, to produce a fictitious suspect who could be blamed for the murder[s]" and was going to "attempt to produce evidence that the defendant spray painted graffiti throughout his house, where the victims were killed." The motion went on to allege that the State had produced a curriculum vitae and a report from a purported expert in the area of forensic linguistic analysis (FLA), but that "FLA is not an accepted science" and "[t]o allow this FLA testimony under the rubric of expert testimony would be unfairly prejudicial." Defendant sought an order prohibiting any mention of FLA evidence or, in the alternative, "prohibiting the solicitation of expert testimony on the subject of FLA, or grant[ing] the [d]efendant's motion unless the State establishes the validity of the FLA testimony after a *Frye*

Hearing." Defendant also filed a motion *in limine* to bar the testimony of the State's alleged FLA expert, Dr. Robert Leonard.

¶ 11     The trial court granted defendant's motion for a *Frye* hearing. During the hearing the State presented the testimony of Dr. Leonard, and defendant presented the testimony of his own expert, Dr. Ronald Butters. After the hearing, the trial court entered the following order:

> "The Court, after conducting a *Frye* hearing, rules that the testimony of a Linguistic Expert may be admitted to the extent of noting similarities between the questioned documents and the known documents without presenting an opinion as to authorship by a specific person, and similarities between the questioned documents themselves."

¶ 12     Defendant also filed a motion *in limine* to bar Lindell Moore's testimony. Moore is a forensic scientist with the Illinois State Police whose area of expertise is handwriting analysis. The trial court granted the motion with regard to any reference by Moore to the report of Richard Johnson, another laboratory handwriting analyst at the State Police lab in Springfield. The motion's relevancy objection was taken under advisement and reserved until the time of Moore's trial testimony.

¶ 13     Defendant also filed a motion *in limine* to bar evidence of sexually explicit texts, emails, photographs, and videos exchanged between defendant and Tara that were seized from computers and cell phones in defendant's and Tara's possession. An *in camera* review of the many items was conducted. The State argued these items were relevant to show defendant's motive and the intensity of the affair. The trial court permitted three sexually explicit videos, with the caveat that images of breasts, buttocks, and genitalia be blacked out. There was an abundance of intimate photographs, but the State realized all would not be admitted and asked only for a limited amount, which the trial court allowed, again with the caveat that private parts be blacked out.

¶ 14     Both the State and the defense filed pretrial motions and supporting documents with regard to the hearsay testimony of 13 potential witnesses who would purportedly testify to statements made by Sheri regarding defendant's alleged desire for a divorce and his frustration over the fact that he believed his family was holding him back from realizing his full potential. The State presented 11 of these witnesses during a hearing on these motions. After the hearing, the trial court ruled broadly that the statements were admissible under section 115-10.6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.6 (West 2010)), which provides a hearsay exception for intentional murder of a witness. The trial court and the parties then addressed each witness's testimony, after which the trial court ruled that some of the testimony would be admitted under motive and intent exceptions to the hearsay rule, while other parts of the testimony would be excluded. The trial court specifically ruled that Meegan Turnbeaugh's text message from Sheri that defendant had "beat her" should be excluded, and the State agreed that it would not offer this testimony. In the end, the State presented the testimony of 5 of the original 13 witnesses.

¶ 15                                           II. Trial

¶ 16     Jason Donjon, a Columbia police officer, testified that on the morning of May 5, 2009, he was dispatched to the Coleman residence after Detective Sergeant Justin Barlow called the station and advised that he had received a call from defendant asking the police to check on his residence. When Donjon arrived, Detective Barlow was on the front porch and explained that

he rang the doorbell, but no one answered. Donjon then went around the back of the house and noticed an open window with the window screen leaning against a table and patio chairs. A photograph of the scene was introduced into evidence. Donjon radioed Barlow, who was still in the front of the house, that he found an open window. After identifying themselves as the police and getting no response, they entered the house through the window. They did not find anyone in the basement, so they went up the stairs, where they discovered red spray paint on the walls near the kitchen with disturbing writing, including the word "fuck" and the words "I am always watching." Photographs of the spray paintings found throughout the house were introduced into evidence.

¶ 17　　Donjon and Barlow heard the garage door open, which turned out to be defendant arriving home. Barlow told defendant to remain outside. Another police officer, Officer Patton, arrived on the scene. Patton came into the house to help Donjon and Barlow search it. When they failed to find anyone on the first floor, they went upstairs. Donjon testified that when he got to the top of the stairs, he looked into a bedroom to his left and saw a white female, who turned out to be Sheri Coleman, lying naked and facedown on the bed. People's Exhibit 10, a picture of how Donjon found Sheri Coleman, was introduced into evidence. Donjon tried to find a pulse, but was unable to get one, and he noticed Sheri's "skin was tough or thick." He attempted to roll her over and noticed that "her head, shoulder, arm, all kind of moved as though they were locked into place when [he] lifted her up." He also noticed that Sheri's chest was "kind of reddish purple deep bruising kind of color." Donjon explained that as a police officer he has investigated traffic accidents in which people have recently died and in checking for a pulse he found the skin on the deceased to be soft, "not thick or rigid when [he] moved them, never had that locking thing." He had also never seen a jaundice color or pooling of blood or bruising like he did on Sheri.

¶ 18　　Donjon then went into Garett's bedroom and found him dead in his bed. People's Exhibit 11, a picture of Garett's deceased body in the bed, was introduced into evidence. Donjon testified there was spray paint in the room, which seemed to be a circle pattern. He also noticed spray paint on Garett's hand and arm. Donjon testified the skin around Garett's eyes and mouth was purple or blue. He noticed that the skin on Garett's neck was thick and tough like it was on Sheri and that his skin was jaundiced and reddish.

¶ 19　　Detective Barlow told Donjon that Gavin was also dead. Donjon identified People's Exhibit 12, a picture of the deceased Gavin lying in his bed with the words "Fuck You" spray-painted in red on the covers. The officers searched the rest of the home and found no intruders.

¶ 20　　On cross-examination, Donjon admitted he had no training in determining time of death. He also admitted that he had not talked to Dr. Nanduri, the pathologist who performed autopsies, or Dr. Baden, an expert who gave an opinion as to time of death, about how Sheri Coleman looked when he found her body.

¶ 21　　Officer Patton testified similarly to Officer Donjon. He testified there was spray painting on the wall leading upstairs, and he specifically remembered "Bitch" being one of the words spray-painted on the wall. He testified the officers heard defendant downstairs yelling something, so they went down and told defendant not to come upstairs. Defendant cooperated and was escorted out to the garage through the kitchen. Patton testified that once defendant was outside, Barlow knelt down, put his hand on defendant's shoulder, and told defendant that his family was "gone," and defendant started to cry. Defendant made no attempt to go back in the

house. Patton then used defendant's garage door opener to shut the garage door, so defendant could not go in the house. Patton remembered defendant saying he needed to call work. Patton heard defendant using his cell phone to call his father. Patton stayed with defendant while he talked to his father. At some point a chaplain arrived and escorted defendant to the back of an ambulance. The police canvassed the neighborhood but found nothing suspicious. Patton testified the coroner, who has since died, arrived at 10:57 a.m., took pictures of the scene, and took body temperatures of the victims.

¶ 22 Patton testified he was at the Coleman residence one other time, January 2, 2009, after the Colemans found a threatening letter in their mailbox. Defendant gave him the letter, which was introduced into evidence. It states: "Fuck You! Deny your God publically or else! No more oppurtunities [*sic*]. Time is running out for you and your family! Have a goodtime in India MOTHER FUCKER!" Patton pointed out that the word "opportunities" was misspelled in the letter.

¶ 23 Gary Hutchinson, a paramedic, testified that he responded to the Coleman house and that defendant was outside crying when he arrived about 7:05 a.m. Hutchinson noticed spray paint on the walls. He found the lifeless bodies of Sheri, Garett, and Gavin. He testified that all were cold and stiff, that rigor mortis had set in, and that in his experience, "most bodies that have rigor mortis have been down for a while." Hutchinson testified that he believed he was sent to the scene "to confirm Barlow's suspicion that [the victims] had been dead for a while." He was only at the house a short time and then transported defendant to the police station via ambulance. On cross-examination, Hutchinson admitted that he did not put anything in his report about rigor mortis being present.

¶ 24 Hutchinson's partner, Jared Huch, testified similarly to Hutchinson. Huch testified that he and Hutchinson checked on Gavin. Huch grabbed Gavin's right arm to see if rigor mortis, a stiffening of the body, had set in. They found rigor mortis present. Hutchinson testified that this is an obvious sign of death, so there was no reason to perform CPR.

¶ 25 Deborah Von Nida, a supervisory investigator with the coroner's office, testified she entered the Coleman residence at 11 a.m., and at 11:08 a.m., the ambient temperature in the bedroom where Sheri was found was 76.6 degrees Fahrenheit. She did a liver probe on Sheri at 11:09 a.m. and found Sheri's core temperature to be 90.4. The ambient temperature in Garett's room was 75.2 degrees, and Garett's core temperature at 11:23 a.m. was 91.8. A core temperature of Gavin's body was not established because there were long strands of hair on his body and spray paint, and Von Nida said they wanted to preserve that evidence.

¶ 26 Dr. Raj Nanduri, a forensic pathologist, performed autopsies on all three of the victims. She performed an autopsy on Sheri at 3:20 p.m. on May 5, 2009. Dr. Nanduri found a ligature furrow, bruising, and abrasions around Sheri's neck. After finding the same type of ligature markings and abrasions on Garett and Gavin, Dr. Nanduri concluded all three died as a result of ligature strangulation. On cross-examination, Dr. Nanduri said she had been asked to give an opinion as to the time of the victims' deaths, but she did not give a time of death, specifically stating, "Time of death is a range." She was not comfortable giving a time of death because she did not have all the findings, and in order to feel comfortable giving a time of death she would need to know other findings because "the body changes in the post mortem status, you have to have all the findings to at least come to an estimate of time of death." Dr. Nanduri was aware that another pathologist had given an opinion as to time of death. She said that in the thousands of autopsies that she had performed, she knew of no other case in which

another pathologist was hired to give an opinion as to time of death. She had not been contacted by the other pathologist to discuss the case.

¶ 27      On redirect examination, Dr. Nanduri testified that she gave a range of time of death of six to eight hours prior to 11:04 a.m. based only upon Sheri Coleman's body temperature at that time. The formula for deciding cause of death can be anywhere from one degree per hour of temperature drop to 2.5 degrees per hour. Eight hours would have made the time of death 3 a.m., and six hours would have made it 5 a.m. Dr. Nanduri testified that it would have been helpful to know the responding police officers' observations as far as rigor mortis, livor mortis, and their tactile experience in touching the bodies, but she did not have that information when she performed the autopsies.

¶ 28      Dr. Michael Baden, the chief forensic pathologist for the New York State Police who was also the chief forensic pathologist in the late 1970s for the United States Congress Select Committee on Assassinations that looked into the deaths of President John F. Kennedy and Reverend Martin Luther King, testified regarding time of death. He estimated he has performed over 20,000 autopsies in his 45-year career. He testified there are three cardinal ways to determine cause of death, including (1) rigor mortis, (2) lividity, which is the color of the body after death caused by the settling of blood, and (3) body temperature. He said that stomach contents can help make a determination, but only if you know when the deceased last ate. He testified a chemical analysis of eye fluid for the purpose of finding potassium can also be of assistance in determining time of death. The major case squad assigned to the instant case contacted Dr. Baden in May of 2009 for his opinion as to the time of the victims' deaths.

¶ 29      Preliminary information provided to Dr. Baden was that there were three victims. The husband and father of the victims said he left the house 1 hour and 15 minutes before the police arrived at the house and found all three dead at around 7:10 a.m. The police said the bodies were cold, rigor mortis was present, and there were changes in the color of the bodies, which sounded like lividity to Dr. Baden. Based upon this preliminary information provided to Dr. Baden, he opined that all three were dead before 5:43 a.m. when the husband left the house. He said it is often difficult to establish a time of death, but in this case, "it wasn't a close call" given the only real information the police needed was whether or not the victims died before or after 5:43 a.m.

¶ 30      The police then provided Dr. Baden with hundreds of crime scene and autopsy photos, police reports, and Dr. Nanduri's autopsy report. Dr. Baden testified that the crime scene photos showed that rigor mortis and lividity were present in Sheri's, Garett's, and Gavin's bodies at 11 a.m. He testified with regard to People's Exhibit 16, a picture of Gavin that shows hair that is longer and a different color than his on his body. Examinations performed on the hair showed that the longer hair was consistent with Sheri's hair, which indicated to Dr. Baden "that the mom was strangled first and that the hair was transferred, transfer evidence, probably on the ligature to Gavin's–when Gavin was strangled by the ligature." Dr. Baden estimated the ligature needed to be applied for "four or five minutes" until the brain is dead. Once the brain is dead, the heart might continue to pump, but there would be gradual diminution of ability for the heart to beat because the brain is dead.

¶ 31      Dr. Baden opined that the same cord was used to strangle all three and that all three deaths occurred around the same time. He believed the murders occurred in sequence, not simultaneously, based upon the hair transfer and the fact that "the boys didn't move from the beds." Dr. Baden opined that the deaths "occurred before three AM. Definitely before five

AM. But probably near to three AM." He believed "they were dead many hours before the first responders got to the scene at seven AM."

¶ 32 On cross-examination, Dr. Baden admitted that different factors can push the body temperature down, including ambient temperature, skin exposure, nudity, and weight. However, he also stated that the entire total would not cause more "than a degree or two" difference. Dr. Baden explained that temperature in a body does not drop for the first three or four hours after death. It remains at 98.6 and then starts dropping, so even if Sheri's body was dropping at a rate of 1.5 degrees per hour as was indicated by the two liver probes, the time of death was before 5:43 a.m.

¶ 33 Justin Barlow testified that on May 5, 2009, he was a detective for the Columbia police department and lived catty-corner from the Coleman family. Prior to the murders, he never spoke with defendant. Defendant first approached the Columbia police on November 14, 2008, after he received a threatening email at his work. Barlow did not have any involvement with that. Officer Zach Hopkins took the call, but it was not a crime necessarily occurring in Columbia; however, the Columbia police agreed to provide extra patrols for the Coleman residence. On January 2, 2009, Officer Patton responded to the Coleman house after a threatening letter, previously set forth herein, was found in the mailbox. On April 27, 2009, defendant reported he found another threatening letter in his mailbox. That letter was introduced into evidence as People's Exhibit 25 and warns defendant "to stop traveling and to stop carrying on with this fake religious life of stealing people's money." It declares that this is the last warning and that "YOUR WORST NIGHTMARE IS ABOUT TO HAPPEN!" The police canvassed the neighborhood and stopped at Barlow's house. Barlow read the letter and thought it sounded more amplified than the first threatening letter, so he called a friend at the Illinois State Police and had a surveillance camera pointed out of his five-year-old's window toward the Colemans' mailbox. The camera was set up on April 28, 2009, and Barlow testified defendant was aware of it.

¶ 34 On May 5, 2009, defendant called Barlow at 6:43 a.m. and said he was on his way home from Gold's Gym in South County, Missouri. He said he would be home in about five minutes and that he was crossing the Jefferson Barracks Bridge from Missouri into Illinois and he tried calling his wife several times to get the kids up, but she was not answering the phone and he was concerned. Barlow, who had been asleep, got up, got dressed, called the police department, and asked for a uniformed officer to meet him at the Coleman residence.

¶ 35 Videotape from the camera installed in Barlow's residence shows defendant leaving the house at 5:43 a.m. It also shows Barlow arriving at defendant's house at 6:51 a.m. The videotape also shows defendant returning home at 6:56 a.m. It took defendant 13 minutes to get from the bridge where he told Barlow he was to his home. Barlow testified that trip normally takes seven minutes.

¶ 36 Barlow entered the Colemans' house with Officer Donjon and testified consistently with Donjon about what they saw inside the house, including spray-painted messages and the deceased bodies of Sheri, Garett, and Gavin. Barlow testified there were no signs of forced entry into the home such as broken glass or debris on the floor where the window was open to the basement. Barlow was aware that he brought moisture into the house with him on his tennis shoes when he entered the basement.

¶ 37 After they heard defendant downstairs asking what was going on, the officers went downstairs and Barlow told defendant that "they didn't make it." Defendant began to cry.

Barlow recalls defendant asking him what happened, but nothing else. Defendant did not demand to see his family, nor did he try to go upstairs. Defendant went outside with the officers and sat on the sidewalk and cried, but Barlow testified no one told defendant what they actually found upstairs. Defendant remained at the scene for approximately 20 to 25 minutes until he was taken by ambulance to the police station, where a 5-hour-and-56-minute interview was conducted. A copy of the interview was played for the jury. The jury did not watch the last hour of the interview after it was determined there was nothing of substance in that hour.

¶ 38    Defendant did not ask how his family was killed. Approximately four hours into the interview, Trooper Bivens, the other officer conducting the interview besides Barlow, specifically asked defendant if he knew how his family died. Defendant replied that he did not know. During the interview, defendant asked for a jacket even though Barlow did not think the interview room was cold. At one point during the interview, officers walked out of the room and defendant picked up one of the officer's notes and looked at them.

¶ 39    On cross-examination, Barlow admitted defendant provided the police with bodily and handwriting samples. Twenty-five minutes into giving the samples, defendant said he was tired of writing, so the police agreed he could stop. Defendant also gave the police the clothes he was wearing, his cell phone, and his computer and authorized the police to open his mail and search his house and car. Barlow also admitted that defendant was being treated as a suspect during the interview.

¶ 40    After Barlow's testimony, defense counsel asked the trial court to revisit its ruling regarding the motion *in limine* concerning sexually explicit photographs and videotapes. Ultimately, the trial court pared down the exhibits even further by allowing a witness to only discuss what was on one of the three videotapes rather than view it. After hearing argument from both sides, the trial court specifically stated:

> "The Court has, I believe, gone back through the items and with that stipulation believes that the State should be allowed an opportunity to present items that I believe show the intensity of the relationship and yet are not as descriptive as even some of the items that the Court had previously pared down from the larger number of photographs.
>
> So in other words, I want the record to be certain that the Court has indeed reviewed the prejudice and the probative value of these particular items, and found that the probative value does not−is not outweighed by possible prejudice.
>
> \*\*\*
>
> Again, I understand the State's frustration. There's a criticism many times voiced toward judges who change their mind, I find more of a criticism with those who won't change their mind.
>
> I believe that the ruling that I have made, although the State may feel that it restricts them, and maybe it does to some extent, but at the same time it accomplishes the purpose of giving the State an adequate opportunity to portray the relationship as they believe the evidence supports; at the same time, it does not unduly point out the relationship to the point that it becomes something that's overbearing and over-focused on the jury."

¶ 41    Officer Ken Wojtowicz, an officer with training and experience in computer forensics, including data acquisition, recovering deleted files, data recovery, and analyzing computers,

then testified about explicit photographs and videos of defendant and Tara retrieved from their computers and cell phones.

¶ 42 Wojtowicz analyzed defendant's Blackberry cell phone, Dell laptop computer, a Dell tower, an Apple laptop, and a thumb drive located at the Coleman residence. He also analyzed Tara's Blackberry and laptop. He found photographs on both Blackberrys and on Tara's laptop, as well as on the thumb drive. Some of the same pictures were found on multiple devices. Wojtowicz testified as to People's Exhibits 30, 31, 32, 33, 34, and 35, which are nonexplicit pictures of defendant and Tara found on one or both of their cell phones. He also testified about People's Exhibits 36 through 50, which are additional nonexplicit pictures of defendant and Tara found during his analysis of the different devices. He said there "were several hundred [more] images on their cellular phones." In addition, he found "several hundred" explicit photographs, depicting either defendant or Tara in various states of nudity. The trial court only allowed four explicit photographs, People's Exhibits 26 through 29. Breasts, buttocks, and genitalia were obscured before the jury was allowed to see them.

¶ 43 Wojtowicz testified that he found several videos on defendant's Dell laptop which depicted defendant and/or Tara without clothing. People's Exhibit 51 was a video of defendant naked in front of a computer, which the jury was allowed to see, except that defendant's genitalia were blacked out. People's Exhibit 52 was a video of defendant masturbating in the shower to a webcam for Tara. The trial court ordered the screen to go black when defendant actually began masturbating, but the audio was maintained. People's Exhibit 53 was another videotape which included a naked Tara in a hotel room in Hawaii. Tara's breasts, buttocks, and genitalia were blacked out. Per its earlier ruling, however, the trial court did not permit the jury to see any of this video, but allowed Wojtowicz to describe the video and play the audio.

¶ 44 Wojtowicz identified People's Exhibit 54 as a note he found on defendant's laptop in the form of an email. The same note was found on defendant's Blackberry. It lists, *inter alia*, Tara's birthday, height, eye color, shoe size, ring size, jean size, favorite flowers, and perfume preferences, and her likes and dislikes regarding food and sports teams. Next to a notation of "Christmas" it states, "promise ring, loves, circle diamond or diamond cross." Another entry on it states, "Our daughter's name: Zoey Lynn Coleman." People's Exhibit 55 is a group exhibit of notes which were found in which Tara updated defendant's calendar when she got her period, her dog's birthday, and defendant's birthday.

¶ 45 Wojtowicz testified that he was aware of the threatening note found in defendant's mailbox in which the word "opportunities" was misspelled. Wojtowicz did a search of defendant's computer and found "several hits of several different files that had the word 'opportunities' misspelled or the word 'opportunity' misspelled the same way with the 'u' replaced–or with the 'o' replaced with the 'u.' " People's Exhibits 56, 57, and 58 are defendant's writings with such misspellings.

¶ 46 Tara testified she and Sheri were best friends in high school and stayed in touch thereafter. Tara knew defendant, but their relationship became more than friends in November 2008 when she saw defendant at a JMM conference. Sheri called Tara and told her to go to the conference which was being held in Florida where Tara lived. Thereafter, she and defendant talked on the phone and texted "constantly." Their relationship became physical in the middle of December 2008 when defendant dropped off Joyce Meyer in Florida so Meyer could go on a cruise. Tara then met defendant at a hotel in Orlando.

¶ 47　　Tara testified she communicated constantly with defendant between November 2008 and May 2009, during which both professed their love for the other. In addition to meeting at a hotel in Orlando, they also met in Arizona and Hawaii while defendant was on business for JMM. Tara testified she stayed in defendant's hotel rooms and had sex with him during these trips. Tara testified she and defendant planned on getting married after he divorced Sheri. The plan was for Tara to move to Illinois. Tara testified that she and defendant got matching promise rings. Tara was wearing hers at trial.

¶ 48　　Defendant told Tara he talked to an attorney about getting a divorce, the divorce papers were being prepared, he was scheduled to pick up the papers from the lawyer on Monday, May 4, 2009, and he was going to give them to Sheri and ask her for a divorce. Defendant did not give Sheri divorce papers on May 4 as planned, explaining to Tara he was unable to do so because Sheri's name was spelled incorrectly. He said he asked that the attorney correct the typo and the papers would be ready to be picked up on May 5, 2009. Tara testified that she and defendant planned to go on a cruise to St. Thomas in June and the tickets had already been purchased with his personal credit card.

¶ 49　　She testified that she talked to defendant on her cell phone on the evening of May 4, 2009, and texted constantly with defendant throughout that day and evening, but stopped texting about 10:30 p.m. when defendant told her he was going to bed. She did not have any communication with defendant on the morning of May 5, 2009. Tara learned about the murders when defendant's father called her at 10 a.m. and told her that Sheri and the boys had been murdered. Tara testified defendant texted her while he was being interrogated at the police station and called her later that evening after he left the police station.

¶ 50　　Two days after the murders, defendant called her again while she was talking with Illinois detectives who came to Florida to question her. When she told defendant she was being interviewed, he said: "Oh really. Interesting." Either she told defendant or defendant told her that the police were looking for a motive. She did not talk to defendant again.

¶ 51　　On cross-examination, Tara said she was aware of four threatening letters defendant received. One was received approximately 18 months prior to the murders. Tara acknowledged that she received sexually explicit photographs from defendant's brother, Keith, and that Sheri's brother contacted her via social media and asked her to marry him. She also acknowledged taking a cruise with another male, Jesse, in December 2008, and she said she used defendant's computers on occasion.

¶ 52　　Elizabeth McHale MacNeil testified that she lives in Tampa, Florida, that she was friends with Tara in the fall of 2008 and spring of 2009, and that she was aware that defendant and Tara were a couple. She testified that approximately a week prior to Christmas 2009, defendant was in Florida and went to the Cheesecake Factory with a group of about 10 people, including Tara and MacNeil.

¶ 53　　Michael Grist, a crime scene investigator employed by the Illinois State Police, testified he took photographs and collected evidence at the crime scene on the day of the murders after a warrant was obtained to search the home. He collected footwear impressions, latent fingerprints, and samples of red spray paint from writings on the walls. He testified there were no signs of forced entry into the home.

¶ 54　　Abby Keller, another crime scene investigator, took video footage of the crime scene which was played for the jury. She also assisted Michael Grist in collecting evidence. She identified People's Exhibits 70 and 71 as pictures she took of defendant's right arm while he

was being interviewed at the police department. On cross-examination, Keller admitted defendant was cooperative and provided police with all the samples they requested, including hair and handwriting samples.

¶ 55    Christine Cincotta testified that she was good friends with Sheri and was employed at JMM with defendant. At the time of her testimony, she was still employed by JMM. Christine testified Sheri sent her text messages in late December 2008 in which Sheri informed Christine that defendant wanted a divorce because defendant believed Sheri was "messing up" his work life. Christine testified she went out with Sheri in January 2009, at which time they discussed defendant's desire for a divorce.

¶ 56    Prior to Sheri contacting Christine about defendant's desire for a divorce, defendant contacted Christine in approximately mid-December 2008 as part of her job at JMM. Christine handled the ministry's cell phones, and defendant sent her a message in which he stated that Sheri sent him some provocative pictures on his JMM-issued Blackberry and he wanted to know if those pictures could be seen by the ministry's staff. Christine was not sure if the pictures could be seen by others, so she checked with JMM's technical staff and was told that no one at JMM could see the pictures. She so advised defendant.

¶ 57    After Sheri sent her text messages about defendant's desire for a divorce, Christine got suspicious and told her brother who also works for the ministry about her conversation with defendant. Her brother then informed Daniel Meyer, Joyce Meyer's son who also works for the ministry. Daniel told her to check defendant's phone, which she did. The records revealed that defendant had made many phone calls and sent many texts to a Florida phone number and that he had received many calls and texts from that same Florida number. It was Christine's understanding that Daniel Meyer was going to follow up with defendant.

¶ 58    Christine testified that JMM's policy regarding employment after an adulterous affair is such that "in most circumstances they probably wouldn't be allowed to work there anymore if they were having an affair." Christine knew of one employee who was terminated for that specific reason. On cross-examination, Christine said she was aware that defendant and Sheri received counseling with Mike Shepard, a pastor at JMM, and Sheri told her that she and defendant were doing better after the counseling. Christine admitted that as far as she knew, defendant was a good father.

¶ 59    Meegan Turnbeaugh testified that she had previously worked with Sheri at JMM and the two remained friends after Sheri stopped working there. In late 2008 and into 2009, Meegan communicated with Sheri two or three times a week via email, instant message, and direct phone contact. The prosecutor asked Meegan if she could tell him about "one specific occasion as has been allowed by the Court, in November of 2008, did you have a discussion with her about her relationship with [defendant]?" Meegan replied that she could, and the prosecutor asked if she could "tell us what that was about and approximately when that occurred?" Meegan replied, "I received a text message from Sheri that stated that Chris had beat her up−." Defense counsel immediately objected. At a sidebar, the prosecutor acknowledged Meegan was not supposed to testify in this manner. The trial court sustained the objection and instructed the jury to disregard the testimony.

¶ 60    Meegan then testified that Sheri told her defendant wanted to leave her and told her that she had ruined his life because he could not leave her due to his position at JMM. Meegan testified it was JMM's policy to terminate any employee who was having an adulterous affair while working for JMM. On cross-examination, Meegan admitted Sheri and defendant underwent

counseling, after which Sheri told her on more than one occasion that things were getting back on track.

¶ 61    Defense counsel later moved for a mistrial based upon Meegan's response which included a reference to defendant beating Sheri. The trial court denied defendant's motion.

¶ 62    Kathy Laplante, a good friend of Sheri's from working at JMM, testified that she communicated daily with Sheri in late 2008 and early 2009. She recalled that in one particular conversation in early 2009, Sheri told her defendant wanted a divorce because he was tired of her and she and their children were keeping him from his destiny and what God wanted him to do. Kathy was at the Colemans' the Friday before Sheri was murdered, at which time defendant told her he had a working surveillance system in the house. Defendant and Sheri both told her they had a video of an unknown person putting something in their mailbox, but Sheri told Kathy there was really nothing that could be seen on it.

¶ 63    Kathy was aware that defendant looked into some other job opportunities, such as starting a gym and his own security firm, but he stopped looking for other jobs after he received a raise from JMM in January 2008. Kathy was aware that in the fall of 2008, defendant wanted to take off time from his job in order to renew his wedding vows, but was prohibited from doing so by JMM.

¶ 64    Jessica Wade, a friend of Sheri's through a St. Louis church they both attended, testified she and Sheri communicated almost daily. On Christmas Eve 2008, Sheri told her defendant wanted a divorce because she and the boys were in his way and were hindering his career.

¶ 65    Stephanie Jones, another friend of Sheri's, testified that in late 2008 and early 2009 she was regularly communicating with Sheri via phone, text message, and in person and talked to Sheri multiple times about her marriage. She referred to a series of text messages between her and Sheri on December 27, 2008, during which Sheri specifically asked Jones to pray for her because "Chris wants a divorce." Stephanie said she would indeed pray for Sheri and asked when all of this happened, to which Sheri replied, "a couple of days ago. He said me and my kids are in the way of his job."

¶ 66    Vanessa Riegerix, the Colemans' neighbor, testified that in late 2008, defendant was at her house and talked about wanting to divorce Sheri because she was spending too much money. He said he was going to wait until after the holidays to seek a divorce.

¶ 67    Susan Boyd testified that she worked at JMM from June 2004 until January 2008 as a recruiter in the human resources department. She identified People's Exhibit 74 as a script used to interview JMM applicants. Part of the script included asking applicants if they were divorced since being born again and, if they were, attempting to discern the circumstances of the divorce and whether or not there were any biblical reasons for the divorce. Page seven of the exhibit specifically set forth: "People are reading us, not their Bibles. Anything against Biblical principles, such as married people in adultery, or single people living with the opposite sex, would be grounds for termination." Susan testified she specifically knew of a person who was terminated from JMM because of an adulterous relationship. On cross-examination, Susan admitted she was not working at the ministry in 2000 when defendant was hired and that there were employees who worked at the ministry who were divorced.

¶ 68    Joyce Meyer and her son, Daniel, testified via video depositions, People's Exhibits 75 and 76, respectively. The depositions were played for the jury. Joyce testified that defendant

worked for her for approximately 11 years, starting in security and eventually becoming the supervisor of security and her own personal security guard, earning a salary of $100,000 per year. She said defendant was issued a computer by JMM and she never saw anyone else using that computer other than defendant. Joyce testified that when she was initially interviewed by the police on the day of the murders she was unaware defendant was having an affair, but by the end of the interview, the police informed her that defendant admitted he was having an affair.

¶ 69       In the fall of 2008, Joyce became aware that defendant and Sheri were having marital problems. She discussed the situation with defendant, who told her Sheri was controlling and never happy. Joyce recommended marriage counseling with Mike Shepard, a chaplain with JMM. Defendant and Shepard both reported to Joyce that the counseling was going well.

¶ 70       Defendant advised Joyce that he received an email and letters threatening his family if he did not stop working for JMM. Joyce was unaware of any of her 900 other employees ever receiving such threats. Joyce recalled calling the police on May 12, 2009, after her initial interview. She called to report that she remembered that around the middle of April 2009 defendant did not seem as engaged in his employment as he previously had been. She informed the police that around that same time she noticed defendant started using a personal cell phone in addition to the JMM-issued cell phone. Joyce also recalled taking a JMM-sponsored trip to Florida and defendant asking to stay an extra couple of days to visit with Sheri's friend. At the time, she did not think anything was odd, but in retrospect, she became suspicious.

¶ 71       Joyce admitted that if she knew defendant was having an affair it could "definitely" have affected his job and further admitted that other employees who had been having adulterous affairs had been fired. She explained that a divorce situation is not necessarily a cause for termination, but is looked at on a case-by-case basis, and it is not the divorce that necessarily causes termination, but the morality of the situation.

¶ 72       Joyce testified that defendant called her directly on May 4, 2009, and told her he was not feeling well and asked off for the day. She could not recall defendant ever calling in sick prior to that occasion. She said defendant was a hard worker and she encouraged him to take time off and spend it with Sheri and his family when he was not traveling with his job. She testified that after the murders, defendant resigned.

¶ 73       On cross-examination she admitted that defendant was an excellent employee who started the security division from the ground up. She said Sheri never contacted her personally about marital problems, but contacted her son, who then made her aware of the situation. She recalled that in August 2008, defendant asked for time off for his 10-year anniversary, which he was denied due to a previously planned JMM out-of-town convention on which he was to accompany her. She said she offered defendant other dates which he could take off, but defendant declined. She admitted that to the best of her knowledge defendant loved his children and was good to them.

¶ 74       Daniel Meyer, Joyce's son and chief executive officer of JMM's United States' operations, testified consistently with Joyce about Sheri contacting him about marital troubles and the couple's ensuing counseling. He testified that he became concerned about defendant's JMM-issued cell phone bill because it was increasing. He had the records pulled from JMM's financial department and found there was a particular phone number in Florida defendant was frequently calling even while traveling internationally. Daniel called the number and a woman answered the phone. Daniel confronted defendant, who told him that the number was to a

- 14 -

friend of Sheri's and he had been calling the friend's husband to seek marital advice. Defendant told Daniel he could check with Sheri. Daniel accepted defendant's explanation.

¶ 75     Daniel was aware defendant received threatening emails and letters. He testified he offered to have defendant stop traveling or to have increased security at defendant's house while defendant was traveling, but defendant declined. Daniel agreed there is no policy at JMM that divorce itself is grounds for termination.

¶ 76     Shawn Westfall, a police officer, testified that he responded to a call from the Coleman residence on April 27, 2009, about a threatening letter received in the mailbox. He talked to defendant, who said he found the letter at 6:10 p.m. after checking for the day's mail, not realizing that Sheri had already checked the mailbox at 3:10 p.m. Westfall said that gave a time frame in which the letter was placed in the mailbox. Westfall then canvassed the neighborhood to see if anyone saw anything suspicious during that three-hour time period, but no one did. Defendant also advised him that Sheri received a threatening letter on April 6, 2009, while he was traveling with JMM and that Sheri turned that letter over to the police. Westfall testified he was unaware of any reports of Sheri bringing such a letter to the police. Defendant told Westfall that the camera system he installed was not working because it did not come with a power source and he was waiting for the power source to arrive. In canvassing the neighborhood, Westfall talked to defendant's neighbor Sergeant Barlow, who arranged to have a camera set up in his house pointed toward defendant's mailbox.

¶ 77     Jonathan Peters, a chaplain for the police department, was called to the scene to inform defendant his family had been killed. When he arrived on the scene, defendant was sitting in the driveway. He described defendant as "stoic" after he broke the news to defendant that his family had been killed and said defendant was "absolutely not hysterical." Peters accompanied defendant in the ambulance. During the drive, defendant looked down at his right arm and said, "How did that get there?" referring to some marks on his arm. Peters identified People's Exhibits 70 and 71 of pictures showing the marks on defendant's right arm. Peters testified he later saw defendant strike his right arm on the gurney in the ambulance, but there was no way the marks were caused by the gurney as the marks were there prior to defendant striking the gurney. Peters recalled defendant having a similar conversation with Jerry Paul, Columbia's police captain, about the marks on his arm and told Paul he did not know how he got the marks.

¶ 78     Jerry Paul testified consistently with Peters that the blow to the gurney could not have caused the marks on defendant's arm. Paul described the marks as "some scratches and some redness" with "very preliminary bruising." When Paul asked defendant what happened to his arm, defendant said he did not know, and then "abruptly" changed the subject and started asking Paul other questions.

¶ 79     Four Illinois State Police lab employees testified about evidence collected at the crime scene. Melody Levault, a forensic scientist specializing in microscopy, identified People's Exhibits 77 and 78 as strands of hair recovered from Garett's and Gavin's bodies. She said the hairs were dyed, forcibly removed, and "consistent" with Sheri's hair.

¶ 80     Michael Brown, another forensic scientist, testified that he examined fingernail scrapings from the victims and defendant for DNA analysis. Fingernails from Sheri's right hand contained male DNA, but none of the Coleman males could be excluded as the source of the DNA. There were no significant DNA findings from the fingernail scrapings of Garett, Gavin, or defendant.

¶ 81    Suzanne Kidd, a forensic scientist, specializing in forensic biology DNA, testified that she performed Y-STR testing, a specialized type of DNA testing that looks only at male DNA, on the left-hand fingernail scrapings of Sheri Coleman. She found a partial profile that could not exclude any of the Coleman males as the contributor.

¶ 82    Thomas Gamboe, a forensic scientist who specializes in the areas of firearm, tool mark, footwear, and tire track identification, testified that all the footwear impressions located inside the Coleman residence he examined were consistent with at least one of the police officers who were at the scene, except for one possible footwear impression found near the basement window of the Coleman residence. Gamboe could not say for sure that it was even a footwear impression, noting that it could have been an impression from a tire on a child's toy or from a hand truck or dolly.

¶ 83    Rick Sawdey, a testing lab manager for Mi Windows and Doors in Pennsylvania, testified that he does certification testing for all of Mi's windows and doors. The Colemans' basement window was manufactured by Mi and contains a forced entry resistance plate on the bottom, which means that if someone tries to open the window while that forced entry plate is locked, there would have been damage to it. The Colemans' window showed no damage and showed no signs of being forcibly opened.

¶ 84    James Kientzy, a network director for AT&T, testified that from reviewing defendant's cell phone records, he could determine what tower and which side of the tower calls were made from defendant's phone. Kientzy identified People's Exhibit 81 as a map he created to show which towers had been utilized in making six calls from defendant's cell phone on the morning of the murders. Calls were made at 5:44 a.m., 6:34 a.m., 6:42 a.m., 6:43 a.m., 6:53 a.m., and 6:58 a.m. The 5:44 a.m. call utilized a tower close to defendant's residence on the Illinois side of the Mississippi River, while the 6:34, 6:42, and 6:43 calls utilized towers on the Missouri side of the Mississippi River. The 6:53 a.m. call was made from an area north of a particular tower on the Illinois side of the Mississippi River.

¶ 85    Ken Wojtowicz was called again to testify, this time as an expert in the area of IP addresses about threatening emails sent from a Google Gmail account titled "destroychris@gmail.com." A subpoena was sent to Google, requesting records as far as IP logs and subscriber information for that account. Google then provided the IP addresses that sent the email threats, and Wojtowicz determined that the same IP address that created the account was used to send the threats. Wojtowicz explained that an IP address "is basically like the address, home address for internology, where–where that computer is located at, or the modem that's connecting to the internet is located at." The police obtained a search warrant to search Google's records regarding the account destroychris@gmail.com. Google's response to the search warrant showed that eight emails were created under that account and seven of those emails were sent. The eighth was never sent. Wojtowicz testified the account was created at 8:19 p.m. on November 14, 2008, on defendant's Dell laptop computer which was found at his home. Wojtowicz identified People's Exhibits 59 through 66, the eight threatening emails from defendant's laptop. The first email, People's Exhibit 59, was sent on Friday, November 14, 2008, to a number of different JMM email addresses, with the subject line reading: "Fuck Chris's family. They are dead." The body of the email states:

    "I'm sure this will make it to someone in the company. If you jackasses are like any other company, this will be someone's account. Pass this onto Chris.

Tell Joyce to stop preaching the bullshit or Chris's family will die. If I can't get to Joyce, then I will get to somebody close to her; and if I can't get to him, then I will kill his wife and kids. I know Joyce's schedule, so then I know Chris's schedule. If Joyce doesn't quit preaching the bullshit, then they will die. During the Houston conference, I will kill them all as they sleep. If I don't hit there, then I will kill them during the book tour or the trip to India. I know where he lives and I know they're alone. Fuck them all and they will die soon. Tell that motherfucker next time to let me talk to Joyce. She needs to hear what I have to say and now she will."

¶ 86 People's Exhibits 60, 61, 62, and 63 were much shorter and were also sent on November 14, 2008.

¶ 87 People's Exhibit 64 was sent on Saturday, November 15, 2008, to Dan Meyer, D. Meyer, and defendant's email accounts at JMM and states, *inter alia*:

"I know you all got my fucking email. You think I'm full of shit. Just wait. I will shoot their asses with my 40. Kill them all, I'm so sick of bitches like her taking everybody's cash so she can fly her jet and pamper her white ass. Fuck you all. Tell Chris I will kill them. He has no idea when, but it will happen."

¶ 88 People's Exhibit 65 was also sent on November 15, 2008, to email addresses at JMM, while People's Exhibit 66 was created on Sunday, November 16, 2008, but never sent.

¶ 89 On cross-examination, Wojtowicz admitted that he does not have a degree in computer science and that most of his training consists of classes taught by law enforcement. He further admitted that he did not search defendant's laptop for remote access software which would allow a person to run the computer from a different location, nor did he check for malware or viruses.

¶ 90 Denise Smith, custodian of records at Google, testified that Google gets requests from law enforcement for records and that there is specific software which is automated that pulls the information. She said that the records are kept in the ordinary course of business for Google. In the instant case, Google received two subpoenas and a search warrant to search a Gmail account and IP addresses for messages and subscriber information on the person who created the Gmail account destroychris@gmail.com. Google provided the information to the police.

¶ 91 Marcus Rogers, a professor of computer forensics at Purdue University, testified that he reviewed several images of hard drives given to him by police, including computers from defendant's house, a JMM computer issued to defendant, Tara's computer, and computers owned by defendant's father and brother, as well as some Blackberry devices and an AT&T USP air card. Rogers described how IP addresses work and the fact that only one computer can be issued an address at a time. Defendant's laptop was able to access the Internet via AT&T, and AT&T issued defendant the IP address of 16612813110. Rogers testified: "[Defendant's] lap top has that address, and no other lap top, no other computer connecting to the internet during the period of time that the lap top has that address can have it. So this is unique now for that computer for that period of time." Rogers went on to identify destroychris@gmail.com and People's Exhibits 59 through 66 as being produced on defendant's Dell laptop, which police gave to Rogers to examine, and further testified that defendant's Dell computer had not been operated remotely, but had been turned on and off using a manual switch on the computer during each of the three sessions during which the emails comprising People's Exhibits 59 through 66 had been composed.

¶ 92    Rogers testified the antivirus software on the computer was up to date and there was nothing on the computer to indicate that it ever had a virus. Rogers ran antivirus software on the computer system which indicated no viruses. He specifically stated that "the virus companies are pretty good at keeping up to date with what viruses would have been around in 2008, and the fact that no viruses were found by software in 2011 [when he ran the scans] is really good evidence to indicate that there was nothing on there related to that." He also used Windows Registry on the Dell computer, which gave no indication of any virus software or malware software being installed in that computer system.

¶ 93    On cross-examination, Rogers admitted the Dell laptop had been used many times since 2008 and there was much more information on the computer than what he analyzed. He also noted there were six different user accounts on the Dell laptop.

¶ 94    Robert Leonard, a linguistics professor with a Ph.D. in linguistics and director of the Institute for Forensic Linguistics Threat Assessment and Strategic Analysis, testified as an expert over the objection of defendant. He said he had testified as an expert 10 or 11 other times and has testified for both the State and for the defendant, and in the majority of his cases he has been recruited by the defense. In the instant case, the Columbia police department asked him to analyze threat messages and the known writings of defendant to see if he could discern similarities or dissimilarities between the writings. He testified that he looks for patterns between two sets of documents, the Q documents (which are the writings in which authorship is questioned) and the K documents (which are writings in which the author is known, here 226 emails known to have been written by defendant and a multipage printout of instant messages between defendant and Tara), in order to determine whether there has been common authorship. The Q documents here were two letters, People's Exhibits 13 and 25, and several emails, beginning with People's Exhibits 59, along with People's Exhibits 7, 8, and 9, pictures of writings found on the walls of the Coleman residence, and People's Exhibit 12, a picture of the writing found on Gavin's bed.

¶ 95    Leonard first checked to see whether he could establish that the Q documents were consistent and whether there were similarities that would link them together with common authorship. He found approximately five similarities between the messages. First, he found that the messages written on the walls and the emails began with "fuck," "fuck you," and "fuck Chris," which "is pretty much equivalent." He noted that the FBI assembled a database called the Communicative Threat Database (C-TAD), which has 4,400 criminally oriented communications, and of those only 18 begin with the word "fuck," which makes communications starting with that word rather unique. Second, the documents contain conditional threats. He explained that an unconditional threat would be "I am coming to kill you," whereas a conditional threat is extortion or blackmail such as "if you don't pay us, we will kill you." For example, the letters he examined contained conditional threats including "deny your God publically or else," "You had better stop traveling," and "Stop today or else." Third, the documents describe the motivation for the death threats as defendant's job. Fourth, the gratuitous insults in the writings are limited to "fuck," "motherfucker," "bitch," "son of a bitch," and "SOB." Fifth, the letters contain capitalization in closing.

¶ 96    After analyzing the Q documents, Leonard then went on to look for similarities between the Q documents and the K documents and found four similarities. First, Leonard found contraction patterns, such as saying "I'm" instead of "I am" or "don't" instead of "do not." Second, he found fused spellings, which means a word was fused together rather than

separated as it should be according to standard writing rules, such as "any time" being fused into "anytime." Third, he found apostrophe reversal, including "wont' " and "doesnt'." Fourth, Leonard found that "you" was not often spelled out, but was written simply as "u." Leonard then went on to describe in detail People's Exhibit 84, a document he prepared to show the similarities between the Q and K documents. On cross-examination, Leonard admitted that the FBI refused to give an opinion as to the uniqueness of a variety of phrases that Leonard found to constitute similarities between the documents.

¶ 97       Four witnesses testified regarding red spray paint found on the walls of the Coleman residence after the murders. Adrianne Bickel, a forensic scientist for the Illinois State Police, identified People's Exhibits 86 and 87 as paint scrapings from a picture frame inside the Coleman residence and a paint scraping taken from one of the walls from the home. In Bickel's opinion, the scrapings were likely from a Rustoleum brand of paint called Apple Red. Bickel then contacted Rustoleum for further analysis. No spray paint cans were located in the Coleman home, and no paint was found on the shoes, socks, or swabs of defendant's hands.

¶ 98       Richard Osterman, a chemist formerly employed by Rustoleum, also examined People's Exhibits 86 and 87 and found they could only have come from a Rustoleum spray paint product, either Painter's Touch or American Accents, based upon the unique resins in the samples.

¶ 99       Michael Harloff, a former color chemist at Rustoleum who retired the year prior to trial, opined that People's Exhibits 86 and 87 were from an "Apple Red" can of Rustoleum spray paint based upon his 33 years of experience doing visual comparisons.

¶ 100       Karla Heine, a Columbia police detective, testified a MasterCard credit card was found lying inside the Coleman residence and the police obtained a subpoena to get the credit card information. She reviewed the MasterCard records for the account and found that a can of Apple Red Rustoleum Painter's Touch spray paint was purchased with that credit card on February 9, 2009, at 1:46 p.m. at Handyman True Hardware Store located in St. Louis, Missouri, approximately 7.5 miles from the Coleman home. Heine went to the store and obtained a copy of the receipt, which was signed by "Christopher E. Coleman." People's Exhibit 89, a copy of the receipt, was admitted over defendant's hearsay objection.

¶ 101       Heine also testified that she investigated the alibi of Keith Coleman, who claimed to be in Arkansas the night before and the morning of the murders. She found video footage of him in a Walmart store located in Arkansas at 8:10 p.m. on May 4, 2009. She testified that Walmart is located 313 miles and approximately six hours away from Columbia, Illinois. She also talked to Keith Coleman and his wife, after which it was determined that Keith woke up at approximately 5 a.m. at his home in Arkansas on May 5, 2009, and helped get his stepdaughter ready for school. On cross-examination, Heine admitted that no cans of Apple Red spray paint were seized from the Coleman residence, his car, or any place associated with defendant.

¶ 102       Lindell Moore, a forensic scientist for the Illinois State Police who specializes in document examination and tool marks, was allowed to testify as an expert over the objection of the defense about similarities between writings found on the wall and defendant's known writing. Moore acknowledged that spray paint writings are "awkward and unnatural," but testified to similarities between six alphabet characters, i, g, c, k, b, and p, as well as the suffix "ing" found in the writings on the wall and defendant's journal entries. On cross-examination, Moore estimated that he has compared spray painting on a wall to handwriting samples somewhere between 5 and 20 times, but this was the first time he testified in court regarding spray paint

writings. He admitted that he did not know if the spray paintings were written by one person or two or more people. He merely assumed the spray paintings in the instant case were made by the same person. He could not tell from the diaries and the exemplars he was provided whether the writer was right- or left-handed. He testified that in addition to similarities, he looked for differences and admitted there were differences even with the six letters and "ing" in the questioned writings and the known writings. Moore admitted that it is difficult to compare spray-painted writings to handwritings because the distinct body motions used in handwriting while sitting as opposed to spray painting "make it difficult to reproduce habits of a person's writing." Moore agreed he would expect to find similarities and differences between the spray-painted writings and the writings of any person in the world. On redirect examination, Moore explained that there are inconsistencies in the spray paintings in terms of cursive writing and printing, and the use of small letters and capital letters. Moore found the same inconsistencies within defendant's journal writings, which indicate a similarity between the writings. Moore pointed out that despite the difficulties in analyzing spray-painted writings and handwritings, he found in both "letters that are constructed in ways that would kind of vary from that of how [he] would expect a person to be taught in school."

¶ 103    The State rested and defendant's motion for a directed verdict was denied. The defense called two witnesses. Steven McKasson, a document examiner who works in the private sector and previously worked for the postal service and the Illinois State Police, testified as an expert about the process of comparing questioned and known writings. He explained that "it's not just picking out things that look the same and counting them up, it's a matter of finding that there's enough habits present in the questioned to say this is a person, this is an individual person, then finding that same set of habits in the known." He testified there are many instances in which an identification cannot be made. He said he was retained by the defense and provided with documents, including photographs of the spray paint on the walls and the known samples of defendant. He used a power point presentation, Defendant's Group Exhibit 3, to explain his findings.

¶ 104    McKasson testified that the writings on the wall appeared to be disguised because there was a lack of normalness evidenced by the mixing of capital letters and small letters and cursive writing and printing. He said the situation was complicated by the fact that the writings were spray-painted, which in itself is awkward and involves moving the whole body as opposed to pen writing, which does not. McKasson could not determine how many people were involved in making the writings, nor could he determine if the writer(s) were right- or left-handed. Because the spray paintings were so disguised, he said "it would be pretty unreliable to draw any conclusion other than inconclusive from that comparison."

¶ 105    On cross-examination, McKasson admitted that in his report he stated that it would be a reasonable assumption that one person wrote all of the writings on the walls in the Coleman home. McKasson admitted there were some similarities between the questioned writing and defendant's writing. McKasson could not say that defendant did not write on the wall, nor could he say defendant wrote on the wall. He explained on redirect that there were so many problems with the questioned writings that anybody could have written it, and his findings were inconclusive.

¶ 106    Ronald Butters, a professor of English and anthropology at Duke University, was called to rebut Robert Leonard's linguistics testimony. Butters pointed out problems in Leonard's analysis such as the frequency of all writers to make grammatical errors on occasion and fusing

words like "sometime" or "goodtime" rather than "some time" or good time." As to apostrophe reversal, Butters pointed out the small quantity of the samples "suggests that it's practically meaningless." He also pointed out that defendant's use of apostrophes was correct on many occasions and in his opinion defendant's incorrect use would be nothing more than a typographical error caused by writing too fast in an informal setting.

¶ 107    Butters explained that using "u" for the word "you" in an informal writing such as an email or text is quite common today. Butters also believed Leonard was comparing "apples to oranges." He noted that while Leonard put emphasis on the fact that many writings started out with "the 'F word,'" the word was actually placed in the heading part of a message, not the actual message. He explained that threats and conditions are commonly intertwined and asserted that Leonard's making that a major category was "not very useful." Butters specifically stated that any similarities in the writings "are linguistically meaningless" and the four categories relied upon by Leonard "are useless." Butters agreed with the FBI's conclusion that it could not give an opinion as to similarities between the writings. He knew of no other instance in Illinois where this evidence had been allowed and said the primary use of authorship identification was for investigative purposes only. He testified Dr. Leonard should have refused "to testify about this at all because it's not scientifically valid."

¶ 108    During deliberations, the jury sent out various notes, including a request to see the window and a request for a magnifying glass. Both were provided to the jury without objection from either party. The jury also sent a request to speak to the judge, and the trial court responded with a note to make all requests in writing. The jury then sent a note in which it requested a definition of "reasonable doubt." The trial court responded with a note in which it stated: "You will receive no instruction defining reasonable doubt. You have received the instructions on the law that you're sworn to follow and the evidence. Continue your deliberation." The jury also sent a note requesting copies of Dr. Baden's and Dr. Nanduri's testimony. While the trial court and attorneys were discussing how to address the request, the jury sent another note, stating, "we are a hung jury." The trial court ceased deliberations until it could provide the jury with transcripts of the doctors' testimony and directed the jury to continue deliberations. Ultimately, the jury convicted defendant on all three counts. The trial court sentenced defendant to three concurrent life sentences. Defendant now appeals.

¶ 109                                    ANALYSIS
¶ 110                            I. Forensic Linguist
¶ 111    The first issue we are asked to address is whether the trial court erred in allowing the State to present testimony of an expert linguist on the issue of authorship attribution. Defendant argues the testimony at the *Frye* hearing established that the field of authorship attribution is new and more research is needed before it can become a reliable scientific tool and, therefore, the trial court should have barred Dr. Leonard from testifying as to any similarities or patterns within the questioned documents or to any opinions regarding similarities or patterns between the questioned documents and the known documents. Defendant further contends the trial court erred in allowing the expert testimony because the jurors were capable of comparing the questioned and known documents without the need for expert testimony. The State replies that the *Frye* hearing was unnecessary because the forensic linguist's testimony was neither scientific nor novel, but even assuming *arguendo* that *Frye* applies, the outcome of the hearing was correct. In his reply brief, defendant contends that the State waived the issues of whether

authorship attribution is scientific or new or novel by failing to raise them below; however, whether Dr. Leonard's testimony was scientific or new or novel are not issues which can be waived. His testimony was either scientific or it was not, and it was either new or novel or it was not.

¶ 112    Under *Frye*, "scientific evidence is admissible at trial only if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *In re Commitment of Simons*, 213 Ill. 2d 523, 529-30, 821 N.E.2d 1184, 1188-89 (2004) (quoting *Frye*, 293 F. at 1014). This means that an expert's opinion must be based upon a scientific methodology that is reasonably relied upon by experts in the relevant field, but need not be accepted by all or even most experts in that particular field. *Simons*, 213 Ill. 2d at 530, 821 N.E.2d at 1189. However, a *Frye* hearing is only necessary "if the scientific principle, technique or test offered by the expert to support his or her conclusion is 'new' or 'novel.' " *People v. McKown*, 236 Ill. 2d 278, 282-83, 924 N.E.2d 941, 944 (2010) (*McKown II*). Scientific methodology is considered "new" or "novel" only if it is "original or striking" or fails to resemble something previously known or used. (Internal quotation marks omitted.) *Simons*, 213 Ill. 2d at 530, 821 N.E.2d at 1189 (quoting *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 79, 767 N.E.2d 314, 325 (2002)). A dual standard of review applies with regard to the trial court's admission of expert scientific testimony. *Simons*, 213 Ill. 2d at 530, 821 N.E.2d at 1189. Whether an expert scientific witness is qualified to testify in a subject area and whether the proffered testimony is relevant to the case are questions left to the sound discretion of the trial court, but whether the proffered evidence is sound or novel is subject to *de novo* review. *Simons*, 213 Ill. 2d at 530-31, 821 N.E.2d at 1189.

¶ 113    In the instant case, the proffered evidence was similarities between the questioned documents, email and letter threats and the writings on the walls found at the scene of the murders, and the known documents, emails and instant messages known to have been written by defendant. The trial court ordered a *Frye* hearing "in the interest of safety." After the hearing, the trial court allowed Dr. Leonard to testify about the similarities between the questioned emails and the writings on the wall and between the questioned documents and defendant's known writings, but did not allow Dr. Leonard to give an opinion regarding authorship by a specific person.

¶ 114    First, we agree with the State that evidence of similarities between questioned documents is not scientific. "If an expert's opinion is derived solely from his or her observations and experiences, the opinion is generally not considered scientific evidence." *In re Marriage of Alexander*, 368 Ill. App. 3d 192, 197, 857 N.E.2d 766, 770 (2006). The line that separates scientific and nonscientific evidence is not always clear. *Alexander*, 368 Ill. App. 3d at 197, 857 N.E.2d at 770. However, *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1041 (S.D.N.Y. 1995), specifically held that forensic document examination expertise constituted "technical, or other specialized knowledge," not "scientific knowledge," even though chemistry, physics, and mathematics clearly were used in the work of forensic document examiners. See also *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315-16 (9th Cir. 1995), in which the Ninth Circuit on remand from the Supreme Court noted that "something doesn't become 'scientific knowledge' just because it's uttered by a scientist."

¶ 115    The instant case is similar to *United States v. Van Wyk*, 83 F. Supp. 2d 515 (D.N.J. 2000), in which an FBI agent qualified as an expert on the subject of forensic stylistics was not

allowed to testify as to authorship of unknown writings, but could testify as to similarities between the defendant's known writings and unknown writings. In reaching that conclusion, the *Van Wyk* court specifically found a lack of scientific reliability, noting that "[t]he reliability of text analysis, much like handwriting analysis, is questionable because, as discussed *supra*, there is no known rate of error, no recognized standard, no meaningful peer review, and no system of accrediting an individual as an expert in the field." *Van Wyk*, 83 F. Supp. 2d at 523. Nevertheless, the FBI agent could testify "as an expert regarding the comparisons of markers between the known writings and questioned writings," because his "expertise in text analysis can be helpful to the jury by facilitating the comparison of the documents, making distinctions, and sharing his experience as to how common or unique a particular 'marker' or pattern is." *Van Wyk*, 83 F. Supp. 2d at 524.

¶ 116    The same FBI agent in *Van Wyk* was allowed to testify 10 years later in *United States v. Zajac*, 748 F. Supp. 2d 1340 (D. Utah 2010), a pipe bombing case in which the defendant moved to exclude expert testimony regarding authorship attribution. Even though the FBI agent had since earned a master's degree in linguistics and continued his work in forensic linguistics (*Zajac*, 748 F. Supp. 2d at 1349), he was not allowed to give an ultimate opinion as to whether the two letters were authored by the same person, but was allowed to testify as to similarities between two letters. The court noted that "no clear line exists between scientific knowledge and technical or other specialized knowledge" and noted that "the Rules of Evidence have a liberal thrust, such that there is a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." (Internal quotation marks omitted.) *Zajac*, 748 F. Supp. 2d at 1348. That court further noted that rejecting expert testimony is "the exception rather than the rule" and found rather than disallowing the evidence, the better way to proceed is through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." (Internal quotation marks omitted.) *Zajac*, 748 F. Supp. 2d at 1348.

¶ 117    Our review of the record shows that Dr. Leonard did not apply scientific principles in rendering an opinion. Instead he relied on his skill and experience-based observations. Moreover, we do not believe that Dr. Leonard's testimony presented anything new or novel. As the State points out, courts have been considering this type of evidence for more than a century.

¶ 118    In *Throckmorton v. Holt*, 180 U.S. 552 (1901), a will contest case, the Supreme Court considered "the opinion of a witness as to the genuineness of the handwriting found in the paper, based in part upon the knowledge of the witness, of the character and style of composition and the legal and literary attainments of the individual whose handwriting it purports to be." *Throckmorton*, 180 U.S. at 569. *Throckmorton* held witnesses should be allowed to testify as to composition and character of style, but should not be allowed to render an opinion as to authorship, as that is a question for the jury. *Throckmorton*, 180 U.S. at 569. Clearly, this type of linguistics analysis has been going on for years. While today's experts may be better educated and have garnered more experience, the comparison of documents is not new or novel such that a *Frye* hearing was even necessary in the instant case.

¶ 119    Defendant relies on *People v. McKown*, 226 Ill. 2d 245, 875 N.E.2d 1029 (2007) (*McKown I*), in support of his contention that just because courts have considered forensic linguistic analysis for years does not mean that it is not novel. In *McKown I*, our supreme court stated, "Given the history of legal challenges to the admissibility of HGN test evidence, and the fact

that a *Frye* hearing has never been held in Illinois on this matter, we conclude that the methodology of HGN testing is novel for purposes of *Frye*." *McKown I*, 226 Ill. 2d at 258, 875 N.E.2d at 1037. What defendant fails to consider is that HGN testing is clearly "scientific" because it is based upon a scientific principle that is not considered common knowledge, *i.e.*, consumption of alcohol causes the nystagmus measured by the HGN test (*McKown I*, 226 Ill. 2d at 255, 875 N.E.2d at 1035), whereas forensic linguistic analysis does not require scientific analysis. Upon remand, the trial court determined that HGN testing is generally accepted in the relevant scientific fields and that evidence of HGN test results is admissible, and this finding was adopted by our supreme court. *McKown II*, 236 Ill. 2d at 303, 924 N.E.2d at 955. Accordingly, defendant's reliance on *McKown I* is misplaced.

¶ 120    After careful consideration, we find that the trial court correctly allowed Dr. Leonard to testify in the limited manner in which he did. Dr. Leonard was allowed to discuss similarities between the known writings and the questioned writings, but was not allowed to give an opinion on who authored the questioned documents. Finally, we note that defense counsel vigorously cross-examined Dr. Leonard and presented its own expert linguist, Dr. Butters, a professor at Duke University, to rebut Dr. Leonard's testimony. Accordingly, we find no error in the trial court allowing the State to present the testimony of an expert linguist.

¶ 121                    II. Sexually Explicit Photographs and Videos

¶ 122    The second issue raised by defendant is whether the trial court erred in allowing the State to present sexually explicit photographs of defendant and Tara and two videos of defendant, People's Exhibit 51, a 30-second video of defendant sitting in front of his computer during which defendant pops out of his chair to show Tara his erection, and People's Exhibit 52, a video in which defendant professes his love for Tara while masturbating in the shower. In both videos, defendant's penis is blacked out. Defendant contends the trial court erred in allowing these items into evidence because their probative value on the issue of the intensity of their affair was minimal and was outweighed by the prejudice caused by their admission, specifically a strong likelihood that this evidence would produce intense antagonism and disgust toward defendant. The State replies that the trial court did not abuse its discretion in allowing the photographs and videos into evidence, especially in light of the fact that substantially fewer pictures were admitted than were available, the two videos were short, and defendant's genitalia and Tara's breasts and buttocks were obscured. We agree with the State.

¶ 123    "Evidence is 'relevant' if it has any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Roberson*, 401 Ill. App. 3d 758, 771-72, 927 N.E.2d 1277, 1289 (2010). However, even if evidence is offered for a permissible purpose, it will not be admitted if its prejudicial effect substantially outweighs its probative value. *People v. Dabbs*, 239 Ill. 2d 277, 284, 940 N.E.2d 1088, 1093 (2010). The issue of whether evidence is relevant and admissible is left to the sound discretion of the trial court, and its ruling will not be reversed absent an abuse of discretion. *People v. Pelo*, 404 Ill. App. 3d 839, 864, 942 N.E.2d 463, 485 (2010). A trial court abuses its discretion only where its decision is arbitrary, unreasonable, or fanciful or where no reasonable person would take the view adopted by the trial court. *Pelo*, 404 Ill. App. 3d at 864, 942 N.E.2d at 485.

¶ 124    In the instant case, defendant was employed by an international Christian ministry that strongly disapproved of adultery. The evidence showed that defendant was at risk of losing his

$100,000-per-year job if he was caught having an affair. When the police initially interviewed defendant, he denied his affair with Tara. When defendant learned police were in contact with Tara, he admitted to the affair, but downplayed its intensity. It was the State's theory that defendant killed the victims because he wanted out of his marriage to Sheri so he could marry his lover, Tara, and defendant believed that divorce was not an option. Because defendant downplayed the intensity of the affair, the photographs were a direct reflection of defendant's credibility or lack thereof.

¶ 125 It is important to point out that after the trial began, the trial court revisited its ruling on defendant's motion *in limine* regarding sexually explicit photographs and videotapes and pared down the exhibits even further. Instead of allowing the jury to view three sexually explicit videos, the trial court ordered that the jury be allowed only to hear the audiotape of one of the three videos it originally allowed rather than viewing it. With regard to the video of defendant masturbating in the shower to a webcam, the trial court ordered the screen to go black, but allowed the audio to be maintained. Moreover, Officer Wojtowicz testified there were "several hundred" more sexually explicit photographs he retrieved from defendant's and Tara's electronic devices which were not introduced into evidence.

¶ 126 The trial court specifically noted, "I want the record to be certain that the Court has indeed reviewed the prejudice and the probative value of these particular items, and found that the probative value does not–is not outweighed by possible prejudice." Under these circumstances, defendant has failed to convince us he was unduly prejudiced by the minimal amount of photographs (compared to the hundreds available) and two short videos which were allowed into evidence.

¶ 127 Defendant further complains about two unredacted photographs on the back of foam core boards containing 8-inch by 10-inch enlargements of some of the photographs which show defendant's naked torso and his penis and Tara's buttocks and breasts. Defendant admits the "small unredacted photographs on these exhibits were not objected to at trial." Accordingly, this issue is waived and can only be reviewed if defendant is able to establish plain error.

¶ 128 The plain error doctrine allows a court to review forfeited errors if: (1) the evidence is so closely balanced that the error threatens to tip the scales of justice against the defendant, or (2) the error is so serious that it affects the fairness of the defendant's trial. *People v. Chaban*, 2013 IL App (1st) 112588, ¶ 57, 994 N.E.2d 1057. Contrary to defendant's assertions, we do not believe the evidence was closely balanced. We will discuss the overwhelming circumstantial evidence against defendant when we address the seventh issue raised by defendant. Here, however, suffice it to say that the evidence established that the victims were all dead before defendant left the house, there was no evidence that anyone else entered the house, the threatening emails were sent from defendant's own Dell computer, and defendant had a clear motive for such heinous crimes. Under these circumstances, we do not believe the presence of two small unredacted photographs in the jury room was so serious that it affected the fairness of defendant's trial.


¶ 129                              III. Hearsay Statements of Sheri
¶ 130 The third issue raised on appeal is whether the trial court erred in allowing five witnesses to testify to hearsay statements attributed to Sheri regarding defendant's alleged desire to obtain a divorce and claims that Sheri was ruining his life and whether the trial court erred in denying defendant's motion for a mistrial after one of those witnesses testified defendant beat Sheri.

Defendant contends the trial court erred in allowing the hearsay testimony and abused its discretion in denying his motion for a mistrial after Meegan Turnbeaugh testified she received a text message from Sheri "that Chris had beat her up," because the parties agreed prior to trial that any testimony about defendant beating Sheri was inadmissible. The State responds that the admission of Sheri's statements to friends regarding concerns about her marriage and defendant's desire for a divorce were not an abuse of discretion and were properly admitted under the statutory hearsay exception for intentional murder of a witness (725 ILCS 5/115-10.6(e)(2) (West 2010)), under the doctrine of forfeiture by wrongdoing, and to establish defendant's motive and intent. While the State admits Turnbeaugh's statement regarding defendant beating Sheri was improper, it asserts that the trial court's denial of defendant's motion for a mistrial on this basis was not an abuse of discretion. We agree with the State.

¶ 131    Section 115-10.6(a) of the Code of Criminal Procedure of 1963 (Code) provides:

"A statement is not rendered inadmissible by the hearsay rule if it is offered against a party that has killed the declarant in violation of clauses (a)(1) and (a)(2) of Section 9-1 of the Criminal Code of 1961 intending to procure the unavailability of the declarant as a witness in a criminal or civil proceeding." 725 ILCS 5/115-10.6(a) (West 2010).

The statute requires the circuit court to conduct a pretrial hearing in order to determine the admissibility of any statements offered pursuant to the statute. 725 ILCS 5/115-10.6(e) (West 2010).

¶ 132    During the hearing, the proponent of the statement bears the burden of establishing by a preponderance of the evidence: (1) that the adverse party murdered the declarant and that the murder was intended to cause the unavailability of the declarant as a witness, (2) that the time, content, and circumstances of the statements provide "sufficient safeguards of reliability," and (3) that "the interests of justice will best be served by admission of the statement into evidence." 725 ILCS 5/115-10.6(e) (West 2010). The statute provides that it "in no way precludes or changes the application of the existing common law doctrine of forfeiture by wrongdoing." 725 ILCS 5/115-10.6(g) (West 2010).

¶ 133    The common law doctrine of forfeiture by wrongdoing provides a hearsay exception for statements made by an unavailable witness where the defendant intentionally made the witness unavailable in order to prevent him or her from testifying. *People v. Hanson*, 238 Ill. 2d 74, 939 N.E.2d 238 (2010); *People v. Stechly*, 225 Ill. 2d 246, 272-73, 870 N.E.2d 333, 350 (2007). In 1997, the doctrine was codified at the federal level by Federal Rule of Evidence 804(b)(6) as an exception to the rule against hearsay. Fed. R. Evid. 804(b)(6); *Giles v. California*, 554 U.S. 353, 367 (2008). Federal Rule 804(b)(6) provides a hearsay exception for a statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness. Fed. R. Evid. 804(b)(6). In 2007, our supreme court expressly adopted the common law doctrine as the law of Illinois. *Stechly*, 225 Ill. 2d at 272-73, 870 N.E.2d at 350. *Stechly* makes it clear that as applied in Illinois, the doctrine is "coextensive" with Federal Rule 804(b)(6). *Stechly*, 225 Ill. 2d at 272-73, 870 N.E.2d at 350.

¶ 134    In the instant case, the State asked the trial court to conduct a hearing to determine the admissibility of 13 potential witnesses who would testify to statements made by Sheri regarding defendant's alleged desire for a divorce and his frustration over the fact he believed his family was holding him back from realizing his full potential. The State presented 11 of

these 13 witnesses at a lengthy hearing, after which 5 actually testified at trial over defendant's numerous objections. The State presented a written proffer, and the trial court gave defendant the opportunity to present evidence or challenge the proffer, which defendant failed to do. Based upon the proffer and defendant's lack of any evidence to the contrary, the trial court found that the State met its burden that defendant murdered Sheri and the murder was intended to cause her unavailability at a dissolution proceeding. The trial court found the testimony of the witnesses provided sufficient safeguards of reliability and then went through the proposed statements to determine whether the interests of justice would be served by the statements' introduction into evidence.

¶ 135     The trial court also determined that the statements were admissible to establish motive. The trial court allowed limited testimony that defendant told Sheri she and the boys were holding him back, that defendant wanted a divorce, and that a divorce might cause his job to be in jeopardy. Prior to these witnesses' testimony, the trial court specifically told the jurors that it was for them "to decide if the statements were made, and if so, what weight, if any, you should give to them." Ultimately, five witnesses, Christine Cincotta, Meegan Turnbeaugh, Kathy Laplante, Jessica Wade, and Vanessa Riegerix, testified about Sheri's statements to them concerning the state of her marriage and defendant's desire for a divorce. Their testimony is sufficiently set forth in the "Facts" portion of this opinion.

¶ 136     Defendant's main point of contention with regard to the statutory exception pursuant to section 115-10.6 of the Code and the doctrine of wrongdoing by forfeiture is that there was no evidence defendant actually instituted divorce proceedings. We reject defendant's contention that the preexistence of legal proceedings is a necessity. In *People v. Peterson*, 2012 IL App (3d) 100514-B, 968 N.E.2d 204, the appellate court held that the hearsay statements of the defendant's second wife that she and defendant had been discussing a divorce would be admissible under section 115-10.6 of the Code even though dissolution proceedings had not been filed.

¶ 137     Defendant contends *Peterson* is distinguishable because in that case, the defendant killed his second wife with the intent of preventing her testimony at a hearing on the distribution of marital property and in the instant case the State was arguing that defendant killed his wife because he could not seek a divorce for job reasons. We find this a distinction without a difference. The trial court properly followed all the requirements of the statute, and we cannot say the trial court erred in allowing five witnesses to testify in the manner in which they did.

¶ 138     Furthermore, the statements were also admissible pursuant to the doctrine of forfeiture by wrongdoing. In support of our finding we rely on *People v. Hanson*, 238 Ill. 2d 74, 939 N.E.2d 238 (2010), in which the hearsay testimony by defendant's sister, Katherine, was admitted. Six weeks before the defendant killed Katherine, her husband, and their parents, Katherine told another sister, Jennifer, that the defendant was engaged in a scheme to obtain credit in their parents' names, and the defendant told her that if she told their father, he would kill her. *Hanson*, 238 Ill. 2d at 79, 939 N.E.2d at 242-43. In *Hanson*, no legal proceedings had been filed by the defendant's parents or anyone else regarding the fraud. In rejecting the defendant's arguments that the trial court erred in admitting Jennifer's testimony because the doctrine of forfeiture by wrongdoing does not permit nontestimonial hearsay, and, even if it did, the reliability of the statement must be considered, our supreme court points out that "[h]ad Katherine not been made unavailable by defendant's wrongdoing, she might have testified as to the threat defendant made against her." *Hanson*, 238 Ill. 2d at 97-98, 939 N.E.2d at 252.

Here, if Sheri had not been killed by defendant, she could have testified about defendant's desire to obtain a divorce, but feared losing his job if he did so.

¶ 139    We also agree with the trial court that the hearsay testimony presented through the five witnesses was admissible to establish motive. "Generally, evidence which shows that the accused had a motive to kill the victim is relevant in a homicide case if the evidence establishes the existence of the motive relied upon or alleged." *People v. Robinson*, 189 Ill. App. 3d 323, 343, 545 N.E.2d 268, 281 (1989). In the instant case, defendant told Sheri he wanted a divorce because he believed she and the boys were holding him back from realizing his full potential, but he did not want to jeopardize his job by filing for divorce. Sheri relayed those statements to numerous people. The trial court limited the amount of this hearsay testimony to 5 witnesses out of a potential 13 offered by the State. After careful consideration, we find no error in the admission of this testimony.

¶ 140    Nor can we say that the trial court abused its considerable discretion in denying defendant's motion for a mistrial after Meegan Turnbeaugh improperly testified she received a text message from Sheri that defendant beat her. In general, a mistrial should only be granted in a case where an error is so grave that it infects the fundamental fairness of the trial so that continuing the proceeding would defeat the ends of justice. *People v. Bishop*, 218 Ill. 2d 232, 251, 843 N.E.2d 365, 376 (2006). A trial court has broad discretion in determining the propriety of declaring a mistrial. *People v. Hall*, 194 Ill. 2d 305, 341, 743 N.E.2d 521, 542 (2000). A court can usually cure an inadmissible statement from a witness by sustaining an objection or instructing the jury to disregard what it has heard. *Hall*, 194 Ill. 2d at 342, 743 N.E.2d at 542.

¶ 141    In the instant case, the parties agreed prior to trial that any testimony about defendant beating Sheri was inadmissible. However, our review of the record clearly shows the State did not elicit this testimony: Turnbeaugh volunteered it. Defense counsel immediately asked that the statement be stricken, and the trial court so instructed the jury. Overall, we believe Turnbeaugh's inadmissible testimony was of little magnitude in a case with this many witnesses and this much testimony. Any error was sufficiently cured when the trial court sustained the objection and directed the jury to disregard it. Even assuming *arguendo* the error caused by the inadmissible statement was not cured, any prejudice flowing therefrom was *de minimis* in light of the overwhelming circumstantial evidence against defendant. Accordingly, we find the trial court did not abuse its discretion in denying defendant's motion for a mistrial.

¶ 142                                   IV. Lindell Moore

¶ 143    The fourth issue is whether the trial court erred in admitting the testimony of Lindell Moore in which he compared spray-painted writings found at the murder scene to defendant's handwriting. Defendant contends Moore's opinion as to comparisons between defendant's handwritten exemplars and the spray-painted writings on the wall was too unreliable and too speculative to have been admitted at trial. The State replies the admission of Moore's expert testimony was not an abuse of discretion. We agree.

¶ 144    "Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Gonzalez*, 142 Ill. 2d 481, 487-88, 568 N.E.2d 864, 867 (1991). The determination of whether evidence is relevant and admissible rests within the

sound discretion of the trial court, and a reviewing court should not reverse the trial court's ruling absent an abuse of that discretion. *Pelo*, 404 Ill. App. 3d at 864, 942 N.E.2d at 485. Moreover, it falls to the discretion of the trial court to determine whether expert testimony is admissible. *People v. Mitchell*, 2011 IL App (1st) 083143, ¶ 35, 955 N.E.2d 1180.

¶ 145      Section 8-1501 of the Code of Civil Procedure specifically provides:

> "In all courts of this State it shall be lawful to prove handwriting by comparison made by the witness or jury with writings properly in the files of records of the case, admitted in evidence or treated as genuine or admitted to be genuine, by the party against whom the evidence is offered, or proved to be genuine to the satisfaction of the court." 735 ILCS 5/8-1501 (West 2010).

This statute permits a witness to compare unknown handwriting samples with the known samples of a party in a case. Thus, we cannot say the trial court abused its discretion in allowing Moore to testify.

¶ 146      Defendant admits there are no Illinois cases that specifically address the issue of whether or not testimony comparing known handwriting with spray-painted graffiti should be allowed. He cites to cases from foreign jurisdictions, *People v. Michallow*, 607 N.Y.S.2d 781 (N.Y. App. Div. 1994), and *Fassi v. State*, 591 So. 2d 977 (Fla. Dist. Ct. App. 1991), which are not binding on us. Defendant's main concern is with the unreliability and speculative nature of Moore's testimony. While the trial court possessed the discretion to disallow Moore's testimony if it determined its probative value was minimal, the trial court certainly was within its discretion to allow the jury to assess Moore's testimony and assign the weight, if any, it warranted.

¶ 147      Moore never identified defendant as the author of the writings on the wall; he pointed out similarities, which the jury was free to accept or reject based upon its own visual inspections of the photographs of the writings on the wall. Defense counsel did an admirable job of pointing out the unreliability of comparing spray-painted writings with handwritten writings, and defendant's own expert, Steven McKasson, who trained Moore, cast serious doubt on Moore's ability to compare defendant's handwriting samples with the spray-painted writings on the wall. Therefore, even if it was error to allow Moore to testify, any error in the admission of his testimony was harmless because Moore's testimony did little to advance the State's case.

¶ 148                                          V. IP Addresses
¶ 149      The fifth issue is whether the trial court erred in admitting the testimony of Marcus Rogers and Kenneth Wojtowicz, who testified about IP addresses. Defendant contends the trial court erred in admitting their testimony because it violated his right to confrontation, included inadmissible hearsay, and lacked a sufficient foundation. The State responds that assignment of computer IP addresses does not implicate the confrontation clause and there was sufficient foundation for the testimony regarding assignment of an IP address to defendant's computer. We agree with the State.

¶ 150      The confrontation clause of the sixth amendment of the United States Constitution, which applies to the states under the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. The confrontation clause is violated by the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to

testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). However, hearsay law exempts business records because businesses have a financial incentive to keep reliable records. See Fed. R. Evid. 803(6). Business records are also generally admitted under the sixth amendment, not because of their reliability under hearsay law, but because they are created for the administration of an entity's affairs, not for the purpose of establishing or proving some fact at trial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

¶ 151    The instant case is similar to *United States v. Wyss*, 542 F. App'x 401 (5th Cir. 2013). In that case, the reviewing court found the defendant's sixth amendment right to confrontation was not violated by allowing the government's computer forensic expert to testify based upon examination and comparisons of the defendant's Internet service provider's records, IP addresses, and data assigned to him on certain dates and times, along with data retrieved from an Internet bulletin board's servers which showed the IP addresses and data that corresponded to postings by the defendant's user name. The *Wyss* court specifically rejected the defendant's contention that a document kept in the regular course of business would become inadmissible if the document was later offered at trial in response to a court order or subpoena. Because the primary purpose of the records was customer billing, Sprint's IP address records were not testimonial in nature and were therefore admissible. *Wyss*, 542 F. App'x at 405.

¶ 152    Likewise, in the instant case, Google's records were not testimonial in nature. Ken Wojtowicz sent a subpoena to Google in which he requested records pertaining to IP logs and subscriber information for destroychris@gmail.com. Google provided the IP addresses that sent the email threats. Wojtowicz explained that an IP address is basically like a home address and shows where the modem that is connecting the computer to the Internet is located. Denise Smith, Google's custodian of records, testified she provided the information in response to the police department's subpoena. She provided the IP addresses for eight specific messages. She testified that the records are kept in the ordinary course of business for Google.

¶ 153    Nevertheless, defendant contends that *Wyss* is distinguishable from the instant case because in that case a representative of Sprint, the defendant's Internet provider service, actually testified and was subject to cross-examination, whereas in the instant case no one from AT&T, defendant's Internet provider service, testified. We disagree and point to the following expert testimony of Marcus Rogers which shows that testimony from an AT&T representative was unnecessary:

"So the Google end will verify that this was address that was connected, and then in the event log itself, which is on the computer, so it's not even AT&T, it's the event log with the computer, the lap itself collects, that information was in there as well. So it's on the computer, it would be in the AT&T records, and it would be in Google's records."

Thus, between the testimony of Denise Smith, the Google representative who testified these records were kept in the regular course of business, and the IP addresses found on the computers, there was sufficient foundation to allow the nontestimonial IP addresses into evidence and allow Rogers and Wojtowicz to testify about them.

¶ 154                                    VI. Receipt

¶ 155    The next issue is whether the trial court erred in allowing the admission of a hardware store receipt and in allowing a witness to testify to its content. Defendant argues the receipt was

hearsay and there was no foundation for its admission. The State replies the receipt was admissible under an exception to the hearsay rule and, thus, there was no further need for extrinsic evidence of authenticity. We agree with the State.

¶ 156   The Illinois Rules of Evidence specifically provide an exception to the hearsay rule as follows: "Receipt or Paid Bill. A receipt or paid bill as prima facie evidence of the fact of payment and as prima facie evidence that the charge was reasonable." Ill. R. Evid. 803(24) (eff. Jan. 1, 2011). We disagree with defendant's argument that this exception only applies to medical bills to show that the bill was reasonable. This exception clearly states that a receipt is an exception to the hearsay rule to show payment.

¶ 157   The admission of evidence is within the sound discretion of the trial court, and a reviewing court will not reverse unless there is a showing of abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234, 940 N.E.2d 1131, 1142 (2010). Here, Officer Heine testified that after reviewing MasterCard statements, she was able to find that a can of spray paint was purchased at a hardware store using the credit card found in defendant's home. Heine went to the store and obtained a copy of the receipt. The receipt was *prima facie* evidence that defendant purchased the spray paint. Defendant was free to rebut that evidence.

¶ 158   Defendant virtually admits that the receipt would have been admissible as a business record exception to the hearsay rule. See Ill. R. Evid. 803(6) (eff. Jan. 1, 2011). This means the State could have brought in another witness, an employee of the hardware store, to establish that the receipt was kept in the regular course of business. However, we find that the receipt and Officer Heine's testimony were sufficiently trustworthy. Thus, we cannot say the trial court abused its discretion in allowing the credit card receipt into evidence.

¶ 159   Even if the trial court erred in overruling defendant's hearsay objection and allowing the receipt into evidence, we find any error harmless. Evidentiary error may be considered harmless if the properly admitted evidence in the case is so overwhelming that no fair-minded fact finder could reasonably have found the defendant not guilty. *People v. Miller*, 173 Ill. 2d 167, 195, 670 N.E.2d 721, 734 (1996). Here, the properly admitted and credible evidence overwhelmingly established defendant's guilt as set forth below.

¶ 160                                    VII. Reasonable Doubt

¶ 161   The final issue raised by defendant is whether the evidence adduced at trial proved him guilty beyond a reasonable doubt. Defendant asserts there are many weaknesses in the State's case, such as a lack of DNA evidence, a confession, or eyewitness testimony. Defendant speculates the jury had many doubts about this case and points to several notes sent by the jury during deliberations in support of this theory. He insists jurors were pushed over the edge by salacious photographs and other inadmissible evidence and that no rational trier of fact could have found him guilty beyond a reasonable doubt. We are unconvinced and reject defendant's arguments, finding overwhelming circumstantial evidence against defendant.

¶ 162   When presented with a challenge to the sufficiency of the evidence, a reviewing court's function is not to retry a defendant. *People v. Givens*, 237 Ill. 2d 311, 334, 934 N.E.2d 470, 484 (2010). Rather, we must consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Davison*, 233 Ill. 2d 30, 43, 906 N.E.2d 545, 553 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319

(1979)). Under this particular standard, a reviewing court must draw all reasonable inferences from the record in the prosecution's favor. *Davison*, 233 Ill. 2d at 43, 906 N.E.2d at 553. A reviewing court should not overturn a defendant's conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Givens*, 237 Ill. 2d at 334, 934 N.E.2d at 484.

¶ 163    The evidence is unrefuted that defendant started having an affair with Tara in November 2008. The affair became sexually charged and progressed to the point where the two were discussing marriage and names for children they planned to have. Defendant was employed as head of security for JMM, earning $100,000 per year. Christine Cincotta, a JMM employee, testified that in most instances a JMM employee who was caught having an affair probably would not be allowed to work at JMM anymore. She knew of one employee who was specifically fired for that reason. Joyce Meyer testified that if she knew defendant was having an affair, it could "definitely" have affected his job and admitted that other JMM employees had been fired for having adulterous affairs.

¶ 164    Joyce Meyer further testified that defendant called her on May 4, 2009, the day before the murders, and asked for the day off due to illness. Meyer could not recall defendant ever calling in sick to work in the prior 11 years he worked for JMM. Tara testified that defendant was going to serve divorce papers on Sheri May 4, 2009. However, when that day arrived, defendant told Tara he could not do so because Sheri's name was spelled incorrectly. Defendant explained to her that his lawyer was going to correct the typo, and he would serve Sheri with divorce papers the next day, which turned out to be the day Sheri, Garett, and Gavin were murdered.

¶ 165    On November 14, 2008, Joyce Meyer and defendant received an email from the account destroychris@gmail.com. Minutes later, defendant received another threatening email. In the ensuing days, more threatening emails were sent to JMM and defendant. Joyce Meyer testified that to her knowledge none of her other 900 employees had ever received threatening correspondence. In response to the threatening emails, defendant contacted his hometown police department and patrols were stepped up in his neighborhood. On January 2, 2009, defendant called the police to report he found a threatening letter in his mailbox. The police were able to determine a time frame in which the letter was placed in the mailbox. Police then canvassed the neighborhood and talked to neighbors about whether they noticed anything or anyone acting suspiciously during that time frame. No one did.

¶ 166    On April 27, 2009, defendant told the police he received another threatening letter. In response, defendant's neighbor, Detective Barlow, installed a camera in his home and pointed it directly at defendant's house. As part of their investigation into the murders, police reviewed film from the camera installed at Barlow's house. It revealed that defendant left his driveway at 5:43 a.m. on May 5, 2009. Defendant called Barlow at 6:43 a.m. to tell him that he was on his way home from the gym and was concerned because he could not reach Sheri by phone. The film shows Barlow arrived at defendant's front door at 6:51 a.m., and defendant arrived home at 6:56 a.m. The film further shows that between 5:43 a.m. and 6:51 a.m., no one went in or out defendant's front door.

¶ 167    The police investigation revealed no type of tracks or markings to indicate that anyone entered the home from the rear. There were no signs of forced entry into the home. A representative from the manufacturer of the basement window found open by police testified that the Colemans' window contains a forced entry resistance plate on the bottom. This means

that if someone tried to open the window while the forced entry plate was locked, there would be damage to it. The Colemans' window did not show any sign of damage.

¶ 168    Investigators examined the threatening emails received by defendant and noticed that the word "opportunities" was misspelled as "oppurtunities." Detective Wojtowicz discovered defendant made the identical misspelling in his own writings. Wojtowicz subpoenaed Google for information about the destroychris@gmail.com account and learned that the IP address on which the account originated was the IP address on defendant's laptop, meaning the threatening emails were sent from defendant's own computer. Professor Marcus Rogers confirmed Wojtowicz's testimony that the threatening emails originated from defendant's computer.

¶ 169    Police officers and paramedics who responded to the scene testified that rigor mortis was present in all the victims. Officer Donjon testified that as he tried to find a pulse on Sheri he noticed Sheri's "skin was tough or thick." When he attempted to roll her over, "her head, shoulder, arm, all kind of moved as though they were locked into place when [he] lifted her up." Lividity was also present, as evidenced by the fact that Donjon noticed blood had already pooled in Sheri's chest. Gary Hutchinson, a paramedic, testified that all the victims were cold and stiff when he arrived at 7:05 a.m. and rigor mortis was present. In his experience, "most bodies that have rigor mortis have been down for a while."

¶ 170    Dr. Raj Nanduri performed autopsies on the victims on the day of the murders. She estimated Sheri died six to eight hours before the autopsy was performed at 11:04 a.m. Accordingly, Sheri was killed between 3 a.m. and 5 a.m. before defendant ever left the house to go to the gym. Because Dr. Nanduri was uncomfortable with giving a specific time of death, the major case squad contacted Dr. Michael Baden, a world-renowned pathologist. While defendant would have us believe that Dr. Baden was nothing more than a hired gun brought in to make the State's case, the record belies defendant's assertion. The State was well aware of the high profile nature of this case. Dr. Baden was contacted to confirm Dr. Nanduri's estimate as to time of death. Dr. Baden's testimony in no way conflicts with Dr. Nanduri's testimony. Dr. Baden testified that while it can be difficult to establish a time of death, this case "wasn't a close call" because the only information the police really needed to know was whether the victims died before or after 5:43 a.m. He opined that all the victims were killed before 3 a.m., but definitely before 5 a.m. Dr. Baden also testified that no DNA of anyone outside the immediate family was found on the victims' bodies.

¶ 171    The police investigated the graffiti writings on the walls found in the Coleman home and discovered the paint used to make the writings was manufactured by Rustoleum and was "Apple Red" in color. Officer Karla Heine testified that after reviewing the records of the MasterCard found inside the Coleman residence, she discovered a can of Apple Red Rustoleum paint was purchased using that MasterCard on February 9, 2009, at a hardware store in St. Louis. Heine obtained a copy of the receipt from the hardware store. It was signed by defendant.

¶ 172    Furthermore, the evidence revealed that there were unexplained scratches and bruising on defendant's right arm as he was taken by ambulance to the police station. People's Exhibits 70 and 71, pictures taken at the police station on the day of the murders, show numerous scratches on defendant's right arm. Jonathan Peters, a chaplain who accompanied defendant in the ambulance, testified he noticed the markings on defendant's arm and later saw defendant strike

his arm on a gurney. Peters was adamant that the injury to defendant's right arm was present before defendant struck his arm on the gurney.

¶ 173 Defendant, head of security for JMM, told Kathy Laplante on the Friday before the murders that he had a working surveillance system in his house. However, after the murders, no working security system was found in defendant's house. Despite all of the threats made against defendant and his family and defendant's expertise in security, it makes no sense that he would have failed to complete installation of the security system or failed to lock his basement window.

¶ 174 Taken as a whole, we cannot say the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to defendant's guilt. To the contrary, the circumstantial evidence against defendant is overwhelming. Any other potential suspects were ruled out by the police. The threatening emails were sent directly from defendant's own computer. The evidence showed defendant possessed not only a motive to kill his wife and two children, but also the opportunity to do so, as all three were dead before 5 a.m., and defendant did not leave the house until 5:43 a.m. The only reasonable inference that can be drawn from the record before us is that defendant was still in the home when the victims were killed.

¶ 175 Finally, we are unconvinced by defendant's argument that the jury had major doubts about this case or his argument that the jury was pushed over the edge by salacious photographs or inadmissible testimony. Considering the length of the trial and the amount of exhibits, the time of deliberations does not seem inordinately long. We also point out that deliberations came to a halt until the transcripts of the doctors' testimony could be prepared and provided to the jury as requested, so the jury did not deliberate as long as defendant asserts. Likewise, as previously discussed, the trial court did not abuse its discretion in allowing any of the sexually explicit exhibits into evidence. The record shows much more sexually explicit material was available, but the trial court used extreme caution in paring down these exhibits. We have previously addressed defendant's arguments regarding inadmissible testimony and have found nothing warranting a new trial.

¶ 176                                                      CONCLUSION

¶ 177 Our Illinois Supreme Court has noted that a trial cannot be conducted without error, and that perfection in trial procedure is virtually unattainable; a defendant in a criminal case is entitled to a fair trial, not necessarily a perfect trial. *People v. Bull*, 185 Ill. 2d 179, 214-15, 705 N.E.2d 824, 841 (1998). Accordingly, we believe that no error or combination thereof was so grave that it infected the fundamental fairness of the trial. After careful consideration and a thorough review of the record before us, we find the State presented sufficient evidence for the jury to find beyond a reasonable doubt that defendant killed all three victims.

¶ 178 This was an intense, lengthy, and sensational trial with many complicated and hotly contested issues. The record is voluminous. The record also reflects the high quality of representation by the trial attorneys for both sides, the skill and fairness of the trial judge, the high quality of the briefs by both parties' appellate counsel, and a consistently high level of professionalism by all. The jury upheld the best traditions of our common law jury system of justice. We commend them all.

¶ 179 For the foregoing reasons, we hereby affirm the judgment of the circuit court of Monroe County.

¶ 180        Affirmed.