2020 IL App (1st) 180563-U
No. 1-18-0563

SIXTH DIVISION
June 12, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 13 CR 1428 02 |
| | ) | |
| DIANSIO M. WILKERSON, | ) | Honorable Brian Flaherty, |
| | ) | Judge Presiding. |
| Petitioner-Appellant. | ) | |

---

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Mikva and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Petitioner's ineffective assistance of appellate counsel claim is not forfeited; and his *pro se* postconviction petition was properly dismissed as frivolous and patently without merit.

¶ 2    Petitioner-Appellant, Diansio Wilkerson, appeals from a judgment dismissing his first stage petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)).  Petitioner contends that he made an arguable claim of ineffective assistance of appellate counsel for failing to raise a meritorious issue on appeal, and therefore his petition was improperly dismissed at the first stage of postconviction proceedings. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     The facts of the underlying case were discussed in detail on direct appeal in *People v. Wilkerson*, 2016 IL App (1st) 132722-U, and will only be repeated here as necessary.

¶ 5     Petitioner and his brother, Darius Wilkerson (Darius), were charged by indictment with multiple felony counts arising from the shooting and attempted robbery of Ramone Vaughn on March 3, 2012, which left Vaughn a paraplegic. *Id*. ¶ 4. Prior to trial, petitioner filed a motion for ballistics testing of a 9-millimeter semi-automatic gun that was recovered from Lorenzo Cureton on June 1, 2013. *Id*. The motion stated that after Vaughn was shot, a 9-millimeter shell casing was recovered from the vehicle in which Vaughn was sitting. *Id*.

¶ 6     In presenting the motion, defense counsel argued that other physical evidence allegedly linking Cureton to the crime that were discovered upon his arrest on another occasion, 11 days after the shooting, including cannabis found on Cureton's person, a jacket found in the car Cureton was driving, and the car itself. *Id*. ¶ 5.  The State responded that none of the witnesses indicated that a third person was involved, and the possibility of a connection was too remote where the shooting occurred on March 3, 2012, and the arrest of Cureton on June 1, 2013. *Id*. The court denied the motion, ruling that the basis was vague, it lacked relevance due to remoteness, and that there was no tie-in between the casing found near the victim after the shooting on March 3, 2012, and the handgun recovered from Cureton on June 1, 2013. *Id*. ¶ 6.

¶ 7                                A. Trial

¶ 8     At petitioner's and Darius's joint bench trial, Darrion Taylor testified that on March 3, 2012, at around 1 p.m., he was with his good friends, Ramone Vaughn and Brian Jones. *Id*. ¶ 7. Taylor drove Vaughn and Jones to Riverdale because Vaughn had arranged to sell someone marijuana. *Id*. Jones sat in the front passenger seat and Vaughn sat in the back seat on the

passenger side. Taylor did not know who they were meeting. *Id*. Taylor stopped the car in Riverdale, while Vaughn spoke to the buyer on his cellphone. *Id*. One or two minutes later, Taylor looked up and saw two men approach on foot. One of the men, whom Taylor identified at trial as Darius, walked up to the front of Taylor's car. The other man, whom Taylor identified as petitioner, approached the back-passenger window where Vaughn was seated. Vaughn handed marijuana to petitioner, who smelled it and handed it back to Vaughn. Petitioner then pulled out a gun and pointed it at Vaughn and stated, "give me everything." Taylor heard a gunshot and immediately drove away. He realized Vaughn was shot and drove him to Ingalls Hospital. *Id*.

¶ 9      Taylor described the shooter to police as a black male, age 19 to 25, five feet eight or nine inches tall, with a slim build and "medium to brown skin," wearing jeans and a black-colored hood or hat. *Id*. ¶ 8. Taylor told police it was possible the shooter had "lighter color eyes" and that the shooter and the second man each wore a dark-colored coat, possibly a Pelle Pelle jacket because it had beads. None of the passengers in the car possessed a weapon that day, and Taylor did not see Darius with a gun. *Id*.

¶ 10     On March 15, 2012, Taylor went to the Riverdale Police Department and viewed photograph arrays. He identified a photograph of Darius as the man who stood at the front of the car and identified petitioner as the man who stood at the back-passenger side window. *Id*. Taylor returned to the police station on March 16 and identified Darius in a lineup. On December 13, 2012, Taylor viewed another police lineup and identified petitioner as the man who had approached the back-passenger side window where Vaughn was sitting. *Id*.

¶ 11     Brian Jones's testimony was substantially the same as Taylor's. *Id*. ¶ 9. At trial, Jones identified petitioner as the second man who went to the backseat area and spoke with Vaughn. *Id*. Petitioner wore "like a jacket with a hood on." *Id*. Jones testified that he heard a gunshot from

the back seat, looked back and saw that Vaughn had been shot in the neck, and drove straight to Ingalls Hospital. Nearly two weeks later, Jones identified police photographs of petitioner and Darius in separate lineups. *Id*.

¶ 12    Ramone Vaughn, the shooting victim, identified petitioner and Darius at trial as the men who approached Taylor's car on March 3, 2012. *Id*. ¶ 10. Vaughn had met Darius and began selling marijuana to him on a regular basis. He spoke to Darius by phone every day. However, Vaughn did not know Darius by that name; he knew him only as TJ. On the evening of March 2, petitioner was with Darius when Vaughn sold marijuana to Darius. Vaughn had not seen petitioner before. *Id*. On March 3, Darius phoned Vaughn and asked if he had some more marijuana because his brother wanted to buy half an ounce. Vaughn recognized Darius's voice as the individual he knew as TJ. They eventually agreed to meet later that day. *Id*.

¶ 13    Taylor drove Vaughn and Jones and stopped at the agreed-upon meeting spot, but kept his car running. *Id*. ¶ 11. Vaughn saw Darius and petitioner approach the car. Petitioner asked if it was the same marijuana that Vaughn had sold him before. Petitioner smelled it, then gave it back to Vaughn. He then took a gun from his pocket and told Vaughn, "Give me that shit." Then petitioner shot him once in the neck. Vaughn fell back as the car took off. Taylor and Jones drove him to Ingalls Hospital. He was later transferred to Northwestern Hospital. The shooting left him permanently paralyzed from the chest down. The bullet was still in Vaughn's back at the time of trial. *Id*.

¶ 14    On March 15, detectives came to Northwestern Hospital and showed Vaughn photograph arrays. *Id*. ¶ 12. At the time Vaughn still did not know Darius's real name or petitioner's name. He identified a photo of petitioner as the shooter and wrote under petitioner's photo, "Shot me." He also identified a photo of Darius and wrote "TJ" to the right of the photo. Vaughn did not see

4

anyone other than Darius and petitioner walk up to the car when he was shot. Vaughn did not remember describing one of the offenders as having light hazel eyes. Vaughn testified that the police recovered his cell phone and he told them the last few calls would have been the person he was talking to before he was shot. The number was saved in Vaughn's phone as "TJ." Petitioner did not know Lorenzo Cureton. *Id*.

¶ 15 Detective Willie Darkried testified that on the date of the shooting, he interviewed the eyewitnesses, Taylor and Jones, and later interviewed Vaughn at Northwestern Hospital. *Id*. ¶ 13. He learned from Vaughn that he had met the offenders at a Citgo gas station a week or so before the shooting. Someone by the name of "C.J. or D.J." was the person Vaughn had numerous conversations with and had sold marijuana to before. Vaughn told Darkried the perpetrators were in a blue Chevy Lumina. The police obtained video from the gas station of Vaughn's car and a blue Lumina. On March 14, 2012, the Lumina was stopped in Riverdale and the driver, Lorenzo Cureton, was arrested. *Id*.

¶ 16 Detective Darkried interviewed Cureton who stated that he was not involved in the shooting and that petitioner and Darius had committed the offense. *Id*. ¶ 14. Previously, Taylor and Jones had said that two offenders were involved but they did not know the names of the two but would be able to identify them. *Id*. Police recovered cell phones from the Infinity after the shooting and Darkried looked at Vaughn's call logs. He learned that the last phone call Vaughn had before he was shot was "associated with" a phone used by Lorenzo Cureton.

¶ 17 Darkried testified that to verify Cureton's information, he had Tayler and Jones come to the police station to view photo arrays. *Id*. ¶ 15. They both positively identified photos of Darius and petitioner. Darius was arrested later that day. The following day, Taylor and Jones viewed

lineups and identified Darius as one of the offenders. Darkried went to Northwestern Hospital and showed photos to Vaughn, who identified photos of both petitioner and Darius.

¶ 18 Riverdale police officers testified that on December 14, 2012, petitioner was observed wearing a Pelle Pelle jacket. He ran from police, and a short time later was found hiding in some bushes. Petitioner was placed under arrest. On December 15, Taylor and Jones viewed a lineup and identified petitioner as the shooter. *Id.*

¶ 19 Petitioner's trial counsel called witnesses on petitioner's behalf. A Riverdale police officer testified that he went to Ingalls Hospital on March 3 and spoke to Jones and Taylor, who described the shooter as "male black, medium-skinned complexion, five feet eight inches tall and between 19 and 25 years old." *Id.* ¶ 19. He believed they told him the shooter had light hazel eyes. They gave a description of a black cap, a hooded sweatshirt and jeans, and said the second offender wore a Pelle Pelle jacket. *Id.*

¶ 20 Another officer testified that on March 14, 2012, he observed and stopped a blue Chevy Lumina that matched the description of a car wanted for investigation. *Id.* ¶ 20. Cureton was driving the Lumina. Cureton was placed under arrest. Cannabis was found on his person, and a blue Pelle Pelle jacket was recovered from the trunk. The officer "ran" the Lumina's license plate at that time but at trial did not recall the registered owner's name. *Id.*

¶ 21 A Chicago police officer testified that on June 1, 2013, he arrested Cureton after observing him drop a handgun to the ground and run. *Id.* ¶ 21. The officer chased and apprehended him. The weapon, a 9-millimeter handgun, was recovered. *Id.*

¶ 22 Dominque Jones testified that on the day of the shooting, he met his friends, petitioner, Cureton, and Edward Thomas in Riverdale. *Id.* ¶ 22. As they were standing and conversing, Cureton received a phone call. An older red car pulled up down the street, and Cureton walked to

it. After a few minutes, they heard a shot and the red car drove off. Cureton ran away. Dominque was a good friend of petitioner's and knew he had been arrested for the shooting in December 2012, but never went to the police. *Id.*

¶ 23    Judy Madison, petitioner's aunt, testified that on February 14, 2013, she came to court and saw Vaughn in a wheelchair with his mother. *Id.* ¶ 23. When petitioner was brought out, Madison heard Vaughn's mother ask, "Is that him?" Vaughn said, "No. I never seen him before in my life. I don't know why I am here." Madison did not tell defense counsel that information until the week of trial, five months later. *Id.*

¶ 24    Petitioner testified that on the date in question, he met Dominque and other friends outside a friend's house. *Id.* ¶ 24. He went inside the house for 25 to 30 minutes, and when he came outside, he did not see Cureton. Petitioner was talking to friends when he heard a gunshot. Cureton was the only one by a car, and then he started running. *Id.*

¶ 25    Petitioner testified that on the night of March 3, he went to his child's mother's home in East Chicago, Indiana. *Id.* ¶ 25. When he came back in May 2012, his mother told him he was accused of the shooting and that police were looking for him. He knew his brother Darius had been arrested in connection with the shooting. He denied running from police when he was arrested in December. He testified that he had brown eyes, not hazel eyes. *Id.*

¶ 26    The State presented rebuttal testimony from a police officer that knew Dominique Jones. *Id.* ¶ 26. He testified that he had a conversation with Dominique at a gas station in September 2012, and that Dominique never told him that Cureton committed the shooting. *Id.*

¶ 27    Ultimately, the trial court found the State witnesses to be credible and found that Dominque Jones lacked credibility. *Id.* ¶ 28. The court also found it "coincidental" that petitioner left the day of the shooting to go live with his child's mother in Indiana. *Id.*

¶ 28    Petitioner was found guilty of attempted first-degree murder, aggravated battery, and attempted armed robbery. *Id*. ¶ 2. Petitioner was sentenced to 35 years for attempted first degree murder (including a 25-year enhancement) and a concurrent 10-year sentence for attempted armed robbery. *Id*.

¶ 29                                    B. Appeal

¶ 30    On appeal, petitioner alleged that, based on the defense theory that a 9-millimeter weapon was used in the offense and that another individual, Cureton, committed the offense, the trial court erred in denying petitioner's pretrial motion for ballistics testing on a 9-millimenter handgun found in Cureton's possession 15 months after the shooting. *Id*.  This court found that the trial court did not abuse its discretion in denying petitioner's motion for ballistics testing of the 9-millimeter handgun where the defense theory behind the motion was too speculative and remote. *Id*. ¶ 41.

¶ 31                          C. Postconviction Proceedings

¶ 32    On March 22, 2017, petitioner filed a *pro se* postconviction petition. Petitioner made several arguments, including that the "trial court erroneously allowed a botched identification of the petitioner to eventually convict him without considering the five factors to determine whether an identification is reliable." Petitioner also argued that trial counsel was ineffective for failing to "stick with a severed trial" and that "appellate counsel was ineffective for failing to argue sections A through E [of the postconviction petition], on direct appeal." Petitioner stated that appellate counsel "was ineffective for failing to insert into the petitioner's brief and argument on direct appeal all of the errors highlighted herein."

¶ 33    Petitioner attached to his petition an affidavit stating that he was physically present at the courthouse during the trial court proceedings and was a witness to "every procedural error

8

outlined \*\*\* in my postconviction petition." Petitioner further stated in his affidavit that he did not attempt to rob or shoot the victim on March 3, 2012. Petitioner also attached transcripts from the trial, including testimony that Taylor was shown a photo array and a physical lineup, and that petitioner was the only person from the photo array that was also in the lineup. Taylor testified that he did not view any other lineups besides the one that petitioner was in.

¶ 34    The circuit court summarily dismissed the *pro se* postconviction petition stating:

"Defendant claims that the lineups were improper. It's up for the jury to decide whether or not the lineups were valid regarding the way they were set up. He complains about the defendant's – he complains about [] Taylor's \*\*\* idea of him. Again, its up to the trier of fact, me, to decide if the idea was adequate to convict. He claims that the evidence against him was circumstantial. Again, it's up to the trier of fact to determine whether or not the evidence presented is enough to convict, which it was. And the trial counsel was ineffective or not, in his words, would be, quote, stick with the severed trial, unquote. No indication why it should have been severed. Also[,] [as] the trial judge, I only consider competent evidence against the defendant and not against the co-defendant. I find this petition to be frivolous [and] patent[ly] without merit. Postconviction is dismissed."

¶ 35    On January 29, 2018, the Illinois Supreme Court issued a supervisory order directing this court to allow a late notice of appeal. This appeal follows.

¶ 36                                II. ANALYSIS

¶ 37                          A. Post-Conviction Hearing Act

¶ 38     On appeal, petitioner contends that his postconviction petition should be remanded for second-stage postconviction proceedings where he made an arguable claim of ineffective assistance of appellate counsel based on appellate counsel's failure to raise the following meritorious issue on appeal: that trial counsel was ineffective for failing to move to suppress unreliable identification evidence prior to trial. The Act provides a mechanism by which a criminal defendant can assert that his conviction and sentence were the result of a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a) (West 2016). A postconviction proceeding is not an appeal from the judgment of conviction, but rather is a collateral attack on the trial court proceedings. *People v. English*, 2013 IL 112890, ¶ 21. To be entitled to postconviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that produced the challenged judgment. *Id*.

¶ 39     The purpose of a postconviction proceeding is to permit inquiry into constitutional issues that were not, and could not have been, adjudicated previously on direct appeal. *Id*. ¶ 22. Issues that were raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *Id*. However, the doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record. *Id*.

¶ 40     The Act provides a three-stage process for adjudicating postconviction petitions. *Id*. ¶ 23. At the first stage, a trial court considers whether the postconviction petition is frivolous or patently without merit. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 46. If the postconviction petition survives the first-stage review, it proceeds to the second stage and is docketed "for

further consideration in accordance with Sections 122-4 through 122-6." 725 ILCS 5/122-2.1(b) (West 2016). At the second stage, counsel is appointed and the *pro se* petition may be amended. *Thomas*, 2014 IL App (2d) 121001, ¶ 46. The proceedings advance to the third stage if the State answers the petition or the court denies the State's motion to dismiss. At the third stage, the postconviction petitioner may submit evidence supporting his claim. *Id*.; 725 ILCS 5/122-6 (West 2016).

¶ 41    In this case, the trial court dismissed the petition at the first stage, concluding that petitioner's claims were frivolous and patently without merit. At the first stage, the petition must, among other things, "clearly set forth the respects in which petitioner's constitutional rights were violated." 725 ILCS 5/122-2 (West 2016). A defendant at the first stage need only present a limited amount of detail in the petition. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). "Because most petitions are drafted at this stage by defendants with little legal knowledge or training, this court views the threshold for survival as low." *Id*. "In fact, we have required only that a *pro se* defendant allege enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act." *Id*. Our supreme court has held:

> "[A] *pro-se* petition seeking postconviction relief under the Act for a denial of constitutional rights may be summarily dismissed as frivolous and patently without merit only if the petition has no arguable basis either in law or in fact. A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory, or a fanciful allegation. An example of an indisputably meritless legal theory is one which is completely contradicted by the record. Fanciful factual allegations include those which are fantastic or delusional." (Internal citations omitted.) *Hodges*, 234 Ill. 2d at 16-17.

¶ 42    However low the threshold, the petition must 'clearly set forth' the respect in which the petitioner's constitutional rights were violated." *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32. This means that the pleading must bear some relationship to the issue raised on appeal. *Id*. We review *de novo* the dismissal of a postconviction petition at the first stage. *People v. Coleman*, 183 Ill. 2d 366, 387-88 (1998).

¶ 43                                  B. Forfeiture

¶ 44    As an initial matter, the State contends that petitioner has forfeited this issue on appeal because he did not raise it in his *pro se* postconviction petition. Petitioner responds that although his "petition did not squarely present the issue of appellate counsel's ineffectiveness for failing to argue that trial counsel was ineffective for failing to move to suppress the identification evidence, this is not fatal to his claim." He claims that while he did not specify the legal argument that appellate counsel should have used in addressing the problems with the identification evidence, this court must nevertheless liberally construe a *pro se* petition and should therefore review this issue. We agree.

¶ 45    Petitioner argued in his *pro se* postconviction petition that the trial court had erroneously allowed a "botched" identification of petitioner into evidence, and that appellate counsel was ineffective for failing to make that argument on direct appeal. On appeal from the dismissal of his first-stage petition, petitioner contends that appellate counsel was ineffective for failing to argue that trial counsel was ineffective for failing to move to suppress the identification evidence. Both the *pro se* petition and the appeal allege ineffective assistance of appellate counsel for failing to raise the issue of improper identification evidence. The only difference between the arguments is merely whose error it was to admit the allegedly improper identification testimony into evidence – defense counsel's or the trial court's. It would go against

the spirit of leniency if we were to find that petitioner forfeited this issue merely because he incorrectly framed the issue. See *People v. Edwards*, 197 Ill. 2d 239, 245 (2001) ("While in a given case the *pro se* defendant may be aware of all the facts pertaining to his claim, he will, in all likelihood, be unaware of the precise legal basis for his claim or all the legal elements of that claim.") The postconviction petition bears a relationship to the issue raised on appeal, and we therefore will review the merits of petitioner's ineffective assistance of appellate counsel argument based on trial counsel's failure to move to suppress identification evidence. *Mars*, 2012 IL App (2d) 110695, ¶ 32.

¶ 46    We find support for this conclusion in the case of *People v. Thomas*, 2014 IL App (2d) 121001. In that case, the *pro se* petitioner alleged that a confession to the same crime by another person was erroneously excluded and that appellate counsel was ineffective for failing to raise alleged trial *counsel* errors related to the exclusion of the statements. *Thomas*, 2014 IL App (2d) 121001, ¶ 68. On appeal, the petitioner argued that appellate counsel was ineffective for failing to raise alleged trial *court* errors related to the exclusion of the statements. *Id*. The State argued on appeal that the petitioner had forfeited the issue. The appellate court rejected that argument, finding that the petitioner properly alleged ineffective assistance of appellate counsel and the factual nature of the error, even though he did not know the precise legal theory counsel should have applied in arguing that the statements had been wrongly excluded. *Id*. ¶¶ 85-87.

¶ 47    Similarly, in the case at bar, petitioner alleged ineffectiveness of appellate counsel in both his *pro se* postconviction petition and on appeal. In his postconviction petitioner, petitioner based his ineffective assistance of appellate counsel claim on counsel's failure to raise alleged trial court errors on appeal – arguing that the trial *court* made a mistake in allowing the State to present the identification evidence. On appeal, petitioner bases his ineffective assistance of

13

appellate counsel claim on counsel's failure to raise trial counsel's errors – arguing that *trial counsel* erred in failing to move to suppress the identification evidence. The underlying argument – that the identification evidence was improper and should not have been admitted – is the same. Accordingly, we reject the State's forfeiture argument and now address the merits of the issue on appeal.

¶ 48                              C. Ineffective Assistance of Counsel

¶ 49    Petitioner claims that he stated a gist of a constitutional claim in his *pro se* first-stage postconviction petition where he alleged that appellate counsel was ineffective for failing to raise the meritorious claim on appeal that trial counsel was ineffective for failing to move to suppress identification evidence that was obtained using a suggestive photo array and lineup procedures.

¶ 50    To prevail on a claim of ineffective assistance of counsel, a petitioner must show both that counsel's performance "fell below an objective standard of reasonableness" and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). At the first stage of postconviction proceedings under the Act, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17. Ultimately, a "gist" of a constitutional claim of ineffective assistance of appellate counsel turns on "whether petitioner's underlying ineffective assistance of trial counsel claim would have been successful if raised on direct appeal." *People v. Childress*, 191 Ill. 2d 168, 174-75 (2000). "Unless the underlying issue is meritorious, petitioner suffered no prejudice from counsel's failure to raise it on direct appeal." *Id.* at 175. We therefore must determine whether petitioner's underlying ineffective assistance of trial counsel claim would have been successful if raised on direct appeal. *Id.*

¶ 51    As an initial matter, we note that on appeal, petitioner makes several arguments in support of his ineffective assistance of appellate counsel claim that did not appear in his postconviction petition. Namely, petitioner makes the following arguments on appeal that did not appear in his postconviction petition in support of his argument that identification evidence should have been suppressed: (1) the first officer who interviewed Jones and Taylor interviewed them at the same time; (2) the photo arrays were suggestive because they were not administered in a double-blind fashion; (3) the men who appeared in the lineup with petitioner were all older than petitioner; (4) the stress of the situation may have contributed to the unreliability of the identification; and (5) all the witnesses were intoxicated.

¶ 52    The problem with these arguments is that they were not raised in the petition that petitioner filed in the trial court. Our supreme court has explained that the question raised in an appeal from an order dismissing a postconviction petition is whether the allegations *in the petition*, liberally construed and taken as true, are sufficient to invoke relief under the Act. (Emphasis in original.) *People v. Jones*, 211 Ill. 2d 140, 148 (2004). Thus, any issues to be reviewed must be presented *in the petition* filed in the circuit court, and a defendant may not raise an issue for the first time while the matter is on review." (Emphasis added.) *Id*. Here, petitioner made the following arguments in his pro se postconviction petition:

"On July 10, 2013, Detective Willie Darkried testified that both [] Taylor and []
Jones viewed photographic and live line-ups that had the petitioner as the only
consistent potential suspect in each line-up. *** Detective Darkried also testified
that the shooter's [*sic*] description was that the perpetrator had hazel eyes. ***
First, the above described live line-up procedure was botched where petitioner
was strategically placed in four (4) separate line-ups alone, his eyes are not hazel,

plus the petitioner had a missing tooth on March 3, 2012. The trial court erroneously allowed a botched identification of the petitioner to eventually convict him without considering the five factors determining whether an identification is reliable; *i.e*. (1) the opportunity to view the culprit at the time o the crime; (2) the degree of attention at the time of the crime; (4) the level of certainty when identifying the defendant at the confrontation; and (5) the length of time between the crime and identification. *** As it pertains to the five aforecited [*sic*] principles: (1) on July 9, 2013, [] Taylor testified that he was on his phone periodically while the shooter was at the car; (2) that he was glancing back-and-forth from rearview mirror to his phone; (3) that the shooter had on a dark colored coat, light jeans and could not provide any other information; (4) Mr. Taylor never mentioned the level of certainty of his identifications and (5) it took both [] Taylor and [] Jones ten to fifteen days to positively identify the petitioner. *** This is a classic case of suggestive identification procedures and arbitrary police investigating."

¶ 53    Thus, while petitioner's claims of a "botched" identification were based on the fact that petitioner was the only consistent potential witness in both the photo arrays and live lineups, and that Taylor and Jones were unreliable witnesses, there was simply no mention of the other arguments petitioner now makes on appeal in support his ineffective assistance of counsel claim. We find our supreme court's decision in *People v. Petrenko*, 237 Ill. 2d 490, 502 (2010), to be helpful here. In *Petrenko*, the defendant argued in his *pro se* petition that trial counsel was ineffective for failing to contest the validity of a search warrant that was issued to his home. *Id*. According to the defendant, trial counsel should have contested that warrant in part because mail

that "7, 8, 9 months old addressed to the victim" failed to establish probable cause. *Id*. On appeal and before our supreme court, the defendant argued that trial counsel should have requested a *Franks* hearing to contest the validity of a search warrant (see *Franks v. Delaware*, 438 U.S. 154 (1978)). In support of this argument, the defendant alleged that the requesting officer showed reckless disregard for the truth by failing to disclose in the supporting affidavit that the mail found in the defendant's trash was several months old. *Id*.

¶ 54    Our supreme court found that while the defendant's ineffective assistance of counsel claim in his postconviction petition mentioned the age of the mail that was found in the defendant's trash, it was not mentioned as an example of information that was wrongly withheld from the issuing judge. *Id*. at 503. Rather, it was mentioned only in the context of arguing that the remaining evidence, including the mail, was insufficient to support a probable cause finding. *Id*. The court found, "[f]or this reason, we hold that defendant has forfeited any ineffectiveness claims on review that are premised upon the requesting officer's failure to disclose the age of the mail found in defendant's trash." *Id*. We likewise find that in the case at bar, petitioner has forfeited any ineffectiveness claims on review that are premised upon allegations not made in the petition that was filed in the trial court.

¶ 55    Turning to the arguments that have been preserved on appeal, we find that there is nothing in the allegations to suggest that appellate counsel's performance arguably fell below an objective standard of reasonableness. Rather, petitioner's allegations regarding the alleged identification errors are contradicted by the record. The identifications would not have been suppressed because they were not unnecessarily suggestive, and even if they were, the witnesses' identification testimony was independently reliable.

¶ 56    Normally, as the trial court noted, the jury decides the weight that an identification deserves; and the less reliable the jury finds the identification to be, the less weight the jury will give it. *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003). However, sometimes an identification is so "unnecessarily suggestive" that the due process clause prevents it from reaching the jury. *Id*. When ruling on a motion to suppress, a court conducts a two-part inquiry. *People v. Rodriguez*, 387 Ill. App. 3d 812, 829 (2008). "First, the defendant must prove that the confrontation was so unnecessarily suggestive and conducive to irreparable misidentification that he was denied due process of law." *Ramos*, 339 Ill. App. 3d at 897.

¶ 57    If the defendant satisfies this burden, then the burden switches to the State to prove that the identification was "independently reliable." *Id*. A trier of fact assesses the reliability of identification testimony in light of all the facts and circumstances including the *Biggers* factors: (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness; (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification. *People v. Richardson*, 123 Ill. 2d 322, 348 (1988) (citing *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)). We note that "the failure to file a motion to suppress or the withdrawal of such a motion prior to trial does not establish incompetent representation when it turns out that the motion would have been futile." *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 58    Here, in support of petitioner's contention that the identifications were unduly suggestive, he argued in his postconviction petition that Taylor and Jones viewed photographic and live lineups that had petitioner as the only consistent potential witness in each. However, petitioner does not cite to any Illinois case law that states it is unduly suggestive to place a suspect in both a

photo array and a live lineup. See *i.e. People v. Aguilar*, 396 Ill. App. 3d 43, 47-48 (2009) (witness viewed a photo lineup and identified the defendant as the shooter but stated he would have to see the suspect in person to be sure; witness later viewed a lineup at the police station and identified the defendant as the shooter).

¶ 59 To the extent that petitioner relies on a New Jersey case, *State v. Henderson*, 27 A. 3d 872 (N.J. 2011), in support of the proposition that more than one viewing of the same suspect creates "mugshot commitment", we find such reliance to be without merit. We first note that this court is not bound by New Jersey case law. See *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 146 (cases from foreign jurisdictions are not binding on us); see also *People v. McGhee*, 2012 IL App (1st) 093404, ¶¶ 53-54 (noting that *Henderson* significantly changed the framework for evaluating the reliability of eyewitness testimony *in that state*) (Emphasis added)). We reject petitioner's argument that *People v. Lerma*, 2016 IL 118496, ¶ 12, considered *Henderson* in rendering its decision. The *Lerma* court merely noted that prior to trial, in support of his motion to reconsider a pretrial motion *in limine*, the defendant had cited to *Henderson*. *Id*. There was no mention of *Henderson* again in the decision. *Id*.

¶ 60 Accordingly, there is simply nothing in petitioner's postconviction petition that supports a claim for ineffective assistance of counsel for a failure to file a motion to suppress based on unduly suggestive identification evidence. Because the motion would be futile, there can be no ineffective assistance of counsel. *Givens*, 237 Ill. 2d at 331.

¶ 61 Even if we were to find it was arguable that the identification procedures were unduly suggestive, we would nevertheless find that the record contradicts petitioner's claims of unreliability. Specifically, defendant argued in his postconviction petition that Taylor testified he was on his phone periodically while the shooter was at the car, and that he was glancing back

and forth from his phone to the rearview mirror, Taylor only provided information that the shooter was wearing light jeans and a dark coat, Taylor never testified as to his level of certainty in his identification, and that it took Taylor and Jones 10 to 15 days to identify petitioner.

¶ 62    However, Taylor testified at trial that he first saw petitioner and Darius as they were walking towards the car. Taylor watched as petitioner walked to the passenger side window. Taylor could see Vaughn and petitioner from where he was sitting. Taylor testified that Vaughn handed petitioner the marijuana, that petitioner smelled it and handed it back to Vaughn. Taylor watched as petitioner pulled out a gun. When asked on cross-examination if he was looking at his phone when the shooter approached the car, Taylor testified: "Up and down. I was paying attention, then I looked at my phone. I wasn't just directly in my phone." He stated, "I paid attention to them at different points in time as they were coming up to the car. I didn't just directly take my attention off, no." And finally, Taylor stated, "I paid attention throughout the whole process. I wasn't directly eye to eye with everything that was going on, but I paid attention to the process." Defense counsel asked Taylor if he only had "seconds really" to see shooter, Taylor replied, "Not true. Not true. It took them at least a minute almost to get down the street to us, and I noticed them from when they got halfway down the block."

¶ 63    Petitioner contends that Taylor only gave a description of the shooter's clothing, and that was not specific enough. However, the record shows that Taylor and Jones gave police a description to the police of a black male with medium complexion, aged 19 to 25, and five foot, eight or nine inches tall. We do not believe this is too general of a description. Even it was considered a general description, that would not render the witness's identification unreliable since he positively identified defendant in both a photo array and a live lineup. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 28 (description of "three African-American males wearing

20

black hoodies and baseball caps," along with witness's certain identification of the defendant, sufficient to sustain conviction); *People v. Tomei*, 2013 IL App (1st) 112632, ¶¶ 51-52 (witness's description of "two white males" wearing a "dark cap" and "heavy jackets" sufficient to sustain conviction given witness's ability to make a positive identification of defendant).

¶ 64    Petitioner also contended in his postconviction petition that Darkried testified that Taylor and Jones described his eyes as "light hazel eyes." Petitioner contends that his eyes are brown, not hazel. However, our supreme court has specifically found that the discrepancy of a witness's description of a defendant's eyes as hazel covered a spectrum of "light brown to strong yellowish brown." *People v. Camel*, 59 Ill. 2d 422, 432 (1974).

¶ 65    Finally, petitioner argued in his postconviction petition that it took Taylor and Jones 10 to 15 days to identify petitioner. The record shows that the incident occurred on March 3, 2012, and that Taylor and Jones gave a description of the shooter that same day. On March 15, 12 days later, Taylor went to Riverdale Police Department and viewed a photo array, identifying petitioner as the shooter and Darius as the person with petitioner. Jones also identified Darius and petitioner in a photo array about two weeks after the incident. Our supreme court and this court have held that similar and longer lapses between the crime and the identification are not significant. See *People v. Slim*, 127 Ill. 2d at 313; (holding that lapse of 11 days was not significant); *People v. Rogers*, 53 Ill. 2d 207, 214 (1972 (identification made two years after crime); *People v. Malone*, 2012 IL App (1st) 119517, ¶ 36 (upholding identification made one year and four months after date of crime); and *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 35 (two weeks between shooting and identification not significant). Accordingly, we find the time lapse of less than two weeks to be insignificant.

¶ 66     Accordingly, based on the specific facts of this case, we find that the motion to suppress would have been futile, and that therefore it was not arguable that appellate counsel's performance fell below an objective standard of reasonableness for failing to argue on appeal that trial counsel was ineffective for failing to file a motion to suppress the identification evidence. *Givens*, 237 Ill. 2d at 331.

¶ 67     Even if we were to find that appellate counsel's performance was arguably unreasonable, we nevertheless would find that it was not arguable that it prejudiced the petitioner. *Hodges*, 234 Ill. 2d at 17 (at the first stage of postconviction proceedings under the Act, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced.") Had Taylor's and Jones's identification testimony been suppressed, Vaughn's identification testimony would still have been admitted. A positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction (*People v. Vriner*, 74 Ill. 2d 329, 343 (1978)), and another factor in determining whether a witness's identification is reliable is "any acquaintance with the suspect prior to the crime" (*People v. McTush*, 81 Ill. 2d 513, 521 (1980)). Here, Vaughn testified that he had previously met petitioner, and he positively identified petitioner as the person who shot him in a photo array while in the hospital.

¶ 68     Accordingly, based on the specific facts of this case, we conclude petitioner's postconviction petition did not have an arguable basis in fact or in law. The trial court therefore did not err in summarily dismissing the petition as frivolous and patently without merit at the first stage of the proceedings.

¶ 69                                III. CONCLUSION

¶ 70    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 71    Affirmed.